# Louis J. Daly, Appellee, v. Illinois Central Railroad Company, Appellant.

## Gen. No. 16,137.

1. SAFETY APPLIANCE ACTS—*federal statutes construed. Held,* that these acts provided that secure grab-irons or hand-holds should be upon the ends and sides of all tenders for the protection of men engaged in coupling and uncoupling cars.

2. SAFETY APPLIANCE ACTS—*when defense of assumed risk does not lie under federal statutes.* If the defendant has failed to equip a tender with grab-irons or hand rails as required by statutes and the injury of the plaintiff proximately results from such default,. then under such statutes the defense of assumed risk does not apply.

3. SAFETY APPLIANCE ACTS—*when engine and tender engaged in interstate commerce. Held,* that where it appeared that the defendant was engaged in interstate commerce and constantly used the engine in question in the regular course of its interstate commerce business, the Safety Appliance Acts applied and a recovery might properly be had by a plaintiff injured in consequence of the defendant's failure to observe such acts.

4. SAFETY APPLIANCE ACTS—*when servant injured entitled to avail of provisions of.* The Safety Appliance Acts did not intend to limit the meaning of coupling or uncoupling cars to the instant of moving the rod or lever that raises or lowers the coupling pin; if the plaintiff at the time of his injury was in the act of preparing to couple he is entitled to claim the benefit of such acts.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the HON. MARCUS KAVANAGH, Judge, presiding. Heard in this court at the October term, 1909. Affirmed. Opinion filed April 29, 1912.

CALHOUN, LYFORD & SHEEAN, for appellant; JOHN G. DRENNAN, of counsel.

JAMES C. McSHANE, for appellee.

MR. JUSTICE SMITH. delivered the opinion of the court.

The appellee, hereinafter called plaintiff, brought

suit against the appellant, hereinafter called defendant, for damages for personal injuries resulting in the necessary amputation of his right arm at the shoulder. The plaintiff obtained a verdict for the sum of fifteen thousand dollars and the Court entered judgment thereon.

The declaration consisted of two counts. The negligence alleged in the first count was that the defendant failed in its common law duty to furnish for the use of the plaintiff reasonably safe hand-holds, or grab-irons, on the tender of its switch engine, on and about which the plaintiff was working for the defendant as a switchman; also that the defendant was negligent in not warning the plaintiff of the said condition and the danger thereof, describing the situation in some detail. The second count alleged, among other things, that the defendant was a common carrier engaged in interstate commerce and was negligent, in that it failed to place proper and secure hand-holds, or grab-irons, as required by the Federal Safety Appliance Act, on the tender of its engine, on and about which the plaintiff was working for the defendant as a switchman in the moving of interstate commerce.

The jury returned with the general verdict two special findings: One that the plaintiff was entitled to recover on the evidence and the instructions of the Court under the first count, and the other that he was entitled to recover on the evidence and the instructions of the Court under the second count. The defendant insists that the Court erred in refusing to instruct the jury to find for the defendant on the grounds that the evidence did not tend to prove the negligence charged; that the plaintiff assumed the risk, and that the evidence proved the plaintiff was guilty of contributory negligence.

If it be concluded that the Court properly submitted the case to the jury on the second count of the declaration, and, with the special finding of the jury on this

count, the judgment should be sustained thereunder, it will be unnecessary to consider the case in relation to the first count.

The portion of the engine tender in question is described in the defendant's brief as follows: "The tender was of the sloping type, the rear of the water tank being lower than the front. Across its rear ran a footboard, extending over the rails more than a foot on each side, for the use of the men. Fastened on the rear of the tender and about 34 inches above the footboard was a heavy beam, 9 inches wide at the top, extending past each side of the tank 3½ inches. Four inches from each end of this beam, on its top, was fastened an upright post, widest at its base. About six inches above the beam was a horizontal socket connected with the upright and extending 2½ inches on each side from its center. This socket supported one end of a gas pipe, 1¾ inches in diameter and 2½ feet long, running above the beam toward the drawbar. At the other end the pipe was supported by a post. The sole purpose of the gas pipe was to furnish the man a handhold or grabiron in getting on or off the footboard and while riding thereon. The upright extended above the socket several inches and had a head on it 3½inches wide and 1¼ inches thick. In the upper surface of this head was a hole in which could be placed a flag. The diameter of the staff between the socket and the head was 2¼ inches. The distance from the center of the upright to the nearest point of the tank was 4½ inches. From the top of the base beam to the top of the flagstaff was 12¼ inches. The tender was equipped with an automatic coupler, by which a car could be coupled to or uncoupled from it without the necessity of a man going behind the tender. The rod by means of which the coupler was operated extended from 7⅞ inches outside the upright, clear across the rear of the tender. Between the upright and the post on each side of the draw bar, this

rod ran through the pipes forming the handholds, but between the two inside posts it was uncovered so as to connect by a chain with the coupler. The ends of this rod ran outside the sockets attached to the uprights, and were turned down so as to form handles for the use of the men in making couplings. While the rod turned and moved, the pipes themselves were stationary. Even though they might work out of their fastenings, they could not come clear out because of the rod passing through them." Steps led up the inclined rear end of the tender to the front. The corner of one of these steps extended over about one-quarter of the top surface of one of the posts and about one-half inch above it.

The plaintiff was about thirty-six years old. He had worked as a switchman for the defendant at different yards for ten or eleven years. At the time of the accident he was working nights at the Fordham yards handling intrastate and interstate commerce. Between eleven thirty and twelve o'clock on the night in question the switch engine was backing south at the rate of about three miles an hour, pushing a coal car coupled on the rear, or south end of the engine. The plaintiff threw the switch and stood on the east side of the track waiting to get on the rear footboard of the engine, to be in position to cut the car off at the place the fireman would designate on the track they were entering. As the rear end of the engine came up to the plaintiff, holding his lantern in his left hand, he attempted to step upon the footboard, and at the same time reached out with his right hand with the palm down to grasp the top of the post at the southeast corner of the tender. The step projecting over this post, as stated, prevented the plaintiff from securing a hold on the post, and he lost his balance and fell. The wheels passed over and crushed his right arm, necessitating the amputation as stated.

It is claimed by the defendant that the evidence did

not tend to prove the negligence averred in the second count of the declaration, to which it should be understood we confine our consideration. The first proposition to be determined in this connection is whether the said posts might properly be held under the evidence to be handholds. The defendant says that the top part of the post, the portion extending above the end handhold, was not a handhold, but was a flag post, that is, having a hole in the top, it was for the purpose of holding a flag. The evidence tended to show that the step covered the top of the post in question to an extent that it could not have been so used. But even if the posts were so used as flag posts, it could not avail the defendant if they were also constructed for and used as handholds.

The Federal Safety Appliance Act of March 2nd, 1893, provides:

"That from and after the first day of July, eighteen hundred and ninety-five, until otherwise ordered by the Interstate Commerce Commission, it shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab-irons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

In the Act of March 2nd, 1903, it was further provided:

"That the provisions and requirements of the act (that of March 2, 1893) shall apply in all cases, whether or not the couplers brought together are of the same kind, make or type; and the provisions and requirements * * * relating to train brakes, automatic couplers, grab-irons, and the height of draw bars shall be held to apply to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce, * * * and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith."

These Acts clearly provide that secure grab-irons, or handholds, shall be upon the ends and sides of all tenders for the protection of men in coupling and uncoupling cars. That there was a secure grab-iron at the end of the tender in question is not controverted. There was no evidence of any grab-iron on the side of the tender other than the post in question and the iron rods projecting therefrom, of which there were two. One, the end grab-iron, extending from inside the post along the rear of the tender, which under the facts in evidence could hardly be said to conform to the statute requiring a secure grab-iron on the side of the tender. The other was the coupling rod extending from the coupling apparatus in the middle of the rear end of the tender through the hollow end grab-iron, the post, and projecting, in the language of defendant's counsel, "outside the sockets attached to the uprights (the posts) and were turned down so as to form handles for the use of the men in making couplings." These handles thus projecting outward from the posts were movable to the extent of about eight inches, in being used for coupling and uncoupling purposes, and, the evidence tended to show, were dangerous to use as grab-irons. If then, the posts on the corners at the rear end of the tender were not constructed to be used as grab-irons or handholds on the sides of the tender, the defendant clearly failed to comply with the statute requiring it to provide secure grab-irons, or handholds, on the sides of the tender. There was also evidence that it was the custom among the switchman to use the said posts as handholds in stepping onto the foot-board of the tender from the side. Under such circumstances was it not a question of fact whether said posts were constructed as and used for the side handholds? If they were so constructed and used, then did the step projecting over a portion of the top of the post interfere with the use of the said post as a grab-iron or handhold, thereby causing the same to be dan-

gerous and insecure as a handhold? These were questions of fact for the jury. Mallott v. Hood, 201 Ill. 202. In view of the said requirements of the Federal statute they might, under all the evidence in the case, properly be answered in the affirmative.

It was the duty of the defendant to comply with the law. In St. Louis & I. M. Ry. v. Taylor, 210 U. S. 281, the Court said in respect to the said Safety Appliance Act: "The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just. If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibition of the law, and there arises from that violation the liability to make compensation to the one who is injured by it." In reference to the questions of fact suggested, however certain the answers thereto may be in the minds of the counsel for the defendant, we are unable to hold that there was no evidence tending to prove the negligence charged, or that the verdict, whereby the jury must have found the defendant guilty of the negligence charged, was clearly and manifestly against the weight of the evidence on this material averment.

In respect to the next contention, that the plaintiff assumed the risk, the said Federal Safety Appliance Act provides: "Any employe of any such common carrier who may be injured by any locomotive, car or train in use contrary to the provisions of this Act, shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing' in the employment of such carrier after the unlawful use of such locomotive, car or train had been brought to his knowledge." If the defendant failed to equip said tender with the grab-irons or handholds required under said Act, then under the Act there was no assumption of risk by the plaintiff in the case at bar. Schlemmer v. Buffalo R. & P. Ry. Co., 205 U. S. 1.

Was the plaintiff guilty of contributory negligence? If the plaintiff knew, or in the exercise of ordinary care would have known, of the step projecting over the said post, it would seem that as a reasonably prudent person, with his experience, he must have known, or be held to have known, the manner in which he attempted to grasp the said post was dangerous, and, under the circumstances, negligent. The plaintiff testified that he knew steps were on the incline of the tender, but he did not know until after the accident that the step projected over the post. There is no evidence to the contrary except the attending circumstances, from which it is claimed he must have known. We are not disposed to hold that the inference from the facts and circumstances in evidence that he knew, is of greater weight than his statement that he did not know. Next, should it be held that the plaintiff, in the exercise of ordinary care, would have known of the step projecting over the said post? The plaintiff was working nights at the yards in question as an extra man. The evidence tends to show that he first went to work with the engine in question on the night of June 4th previous to the accident; that he worked with the said engine about thirteen nights in June and practically every night in July up to and including July 23rd; that he next worked with said engine September 12th and was injured the following night. There were about twenty-five switching crews working in said yards; each crew generally consisting of three men, the foreman, who watched the train and in a general way had charge of and directed the work; the man in the field, who lined up the switches and coupled cars, seldom, if at all, having worked on the engine; the man following the engine, who made couplings on and uncouplings from the engine, and it seems threw the switches at times when they were close to the engine. A Mr. Nolan was foreman in June. The plaintiff gave certain dates in July that he said he remembered

when he was foreman and certain other dates that he was in the field, and said that he first followed the engine in question the night of September 12th, and was also following the engine the night of the 13th, when he was injured. It seems that the foreman and field man seldom did any work on the engine, but at times in going out to and coming from their work, all of the crew, or some of them, would ride on the footboard. The usual manner of boarding the engine with no car attached to it, was to stand in the middle of the track and as the engine approached step on the footboard and at the same time, it may be supposed, grasp the end grab-irons. The plaintiff went to work at seven o'clock in the evening, and usually worked until six o'clock the next morning, occasionally until seven o'clock. It might be conceded that during the hours of darkness the plaintiff would hardly be expected to observe the step projecting over the post unless his attention was in some manner directed to the same, and plaintiff said that before the accident he had not noticed the handhold, and said, referring to the time of the accident: "This was the first time I had the necessity of getting on there with a car attached to it in the position that I did at that time." We state the situation in a general way, but sufficiently to show that the opportunities the plaintiff had to observe said step were not such that in our opinion would warrant us in holding, contrary to the verdict of the jury, that the plaintiff as an ordinarily prudent man, with his experience, exercising ordinary care, would have known the step projected over the said post. Was the plaintiff guilty of negligence in the manner in which he attempted to take a hold upon the post, is the remaining question of fact. Assuming, as from the foregoing it would appear we must, that the plaintiff did not know and that it should not be held by this Court that the plaintiff should have known, in the exercise of ordinary care, that the step projected over the post, we think that the jury might

properly believe that the manner in which the plaintiff undertook to secure a hold upon the post was, under the circumstances, probable and natural, and find the same to be the conduct of an ordinarily careful and prudent switchman under like circumstances. We conclude, after careful consideration, that under all the evidence we would not be warranted in holding as a matter of law that the plaintiff was guilty of contributory negligence. See Campbell v. C. R. I. & P. Ry. Co., 243 Ill. 620.

In El Paso R. R. Co. v. Vizard, 211 U. S. 608, it was contended that the plaintiff ignored the handholds, with which the car was properly equipped, and in the use as a handhold of a rod, not intended as a grab-iron, resulting in his injury, he could not recover on the ground of contributory negligence. The Court there said: "Indeed, in an open, moving car, a hand-rail running through standards on the side and within easy reach, would naturally suggest doing just what the plaintiff did. It certainly could not be declared, as a matter of law, negligence."

The counsel for the defendant further contend that this case does not come within said Federal Safety Appliance Act, because there was no proof that the engine and tender were not at the time engaged in interstate commerce, and also because the plaintiff at the time of the injury was not engaged in coupling or uncoupling the car from the tender.

It was proven that the defendant was engaged in interstate commerce, and that the engine in question was being constantly used in handling interstate commerce; but there was no evidence that the car the engine was pushing at the moment of the accident, was interstate commerce. The defendant, engaging in interstate commerce and constantly using the said engine in the regular course of its interstate commerce business, would seem to bring it within the terms of the amendment of said Act of March 2, 1903, that "the provisions and

requirements hereof and of said Acts relating to train brakes, automatic couplers, grab-irons, and the height or drawbars, shall be held to apply to all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce." Wabash R. Co. v. U. S., 93 C. C. A. 393; U. S. v. C. & N. W. R. Co., 157 Fed Rep. 616.

The plaintiff testified that the car had been on the scales to be weighed, and he had been told to bring it around to the train yard; the switch he had lined up led into the train yard, and at the time of the accident the conductor (foreman) was in the yard lining up the switches, and he, the plaintiff, "had to be in a position to cut off the car when the foreman wanted me to." In C. M. & St. P. Ry. Co. v. Voelker, 65 C. C. A. 226, a switchman was injured while repairing a defective coupler preparatory to coupling the cars, and the Court said: "The contention that the preparation of the coupler for the impact is distinct from the act of coupling, is a mistaken attempt to separate a part of an act from the whole. The preparation of the coupler and the impact are not isolated acts, but connected and indispensable parts of the larger act, which is regulated by these statutes, and the performance of which is intended to be relieved of unnecessary risk and danger." To the same effect as C. J. Ry. Co. v. King, 94 C. C. A. 652, and Campbell v. C. R. I. & P. Ry. Co., 243 Ill. 620. We are disposed to accept the reasoning in these cases rather than that of the majority of the Court in Dawson v. C. R. I. & P. Ry. Co., 114 Fed. Rep. 870, upon which the defendant relies. It cannot be conceived that the Safety Appliance Act intended to limit the meaning of coupling or uncoupling cars to the instant of the moving the rod or lever that raises or lowers the coupling pin. So, whether the plaintiff in attempting to take a position so that he could uncouple the car when directed, which might be any instant thereafter, was in the performance of a "connected and indis-

196     APPELLATE COURTS OF ILLINOIS.

Klauss v. National Council, K. & L. of S., 170 Ill. App. 196.

pensable" part of the. act of uncoupling the car was a question of fact for the jury, and as it appears to us in the case at bar, it is not sufficiently. clear to justify us in holding contrary to the verdict of the jury.

There was no error in the admission of the evidence of the custom of using said posts as handholds, or the rulings of the Court on instructions. The judgment is affirmed.

*Affirmed.*