J. R. OWENS, Appellee, v. NORWOOD WHITE COAL
COMPANY, Appellant.

**Master and servant:** NEGLIGENCE: ASSUMPTION OF RISK: EVIDENCE.
In this action for injuries to a coal miner, caused by the fall of
slate, the evidence is considered insufficient by a majority of the
court to show actionable negligence on the part of defendant,
either in failing to furnish plaintiff with a safe place to work,
or in failing to warn him of the danger; and also that it is
sufficient to show an assumption of the risk; while a minority
of the court think it was such as to require submission of these
issues. The case is determined, however, on the validity of a
prior settlement with plaintiff.

**Same:** SETTLEMENT AND RELEASE: FRAUD: MENTAL CAPACITY: EVI-
DENCE: INSTRUCTION. In this action for personal injuries de-
fended on the ground of settlement, release and full satisfac-
tion of all claims, the evidence is reviewed at length and it is,
*Held,* that plaintiff was mentally competent to understand and
realize the nature and effect of the settlement and release exe-
cuted by him, and in the opinion of the majority of the court
there was not sufficient evidence to take the case to the jury
on the question of fraudulent representations of defendant's agent,
as to what the plaintiff's physician told him regarding the prob-
able duration of his inability to work; and that the court erred
in its instructions authorizing the jury to disregard the release
and settlement, if it found that plaintiff did not have sufficient
mental capacity to understand the nature and effect of the same,
as there was no evidence in support thereof.

**Same:** COMPROMISE AND SETTLEMENT. The law favors the settle-
ment of controversies, even with injured and necessitous per-
sons, if fairly and understandingly made, and especially where
the claim is of a doubtful character, although it will scrutinize
the same for the purpose of detecting fraud and wrong.

**Same.** When an injured person has fairly and knowingly settled
the damages resulting from the negligence of another, the courts
will not interfere simply because he was mistaken in the nature
or extent of his injuries.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN,
Judge.

TUESDAY, NOVEMBER 19, 1912.

ACTION at law to recover damages for personal injury. There was a verdict and judgment for plaintiff, and defendant appeals.—*Reversed.*

*Guernsey, Parker & Miller,* for appellant.

*J. L. Gillespie* and *Bannister & Cox,* for appellee.

DEEMER, J.—On August 5, 1908, the defendant was, and for some time had been, operating a coal mine in Polk county, and plaintiff was engaged in its service. He was a miner of experience, and at the time in question was principally engaged in attending the pumps of the mine, but at intervals, when his attention was not thus required, he assisted in other work when called upon so to do, and at the time of the injury of which he complains he had gone to the assistance of one Grange, who was the timberman in charge of a mine entry spoken of by the witness as "17." Plaintiff had some experience as a timberman, and was acquainted with the manner in which mine entries in that neighborhood were constructed and maintained. It was the duty of Grange to inspect this entry every day, and especially those parts of the roof and walls not protected by timbers placed for that purpose. As the entry was driven further into the mine, the timbering, so far as any was thought to be necessary, was advanced accordingly for the purpose of maintaining a passage or roadway between the hoisting shaft and the places where coal was being excavated. As the excavation of the entry was pushed forward into the mine, the track on which coal cars were operated was also extended, keeping the end of the track, a short distance behind the face of the coal. Between the end of the track and the face of the coal the roof and walls of the entry were left to the inspection

and care of the miner or miners working at that point; but, so far as the entry was completed and track laid, it was the duty of the timberman in charge to look after the safety of the passage. Wherever the condition or character of the roof of the entry appeared to demand it, protection against danger from falling rock and slate was usually provided by setting up posts on which cross timbers and logs were placed. The existence of a defective roof from which a fall is liable to occur may sometimes be discovered upon visual inspection, and, when more obscure, may ordinarily be detected by tapping or sounding with a hammer or pick. This entry was being extended to the east, and from its side at intervals were turned or opened rooms from which miners dug coal which was loaded upon the cars and hauled through the entry to the shaft. Nearest the east or working end of the entry was room known as "No. 7," which was worked by one Murray, and about thirty feet farther westward was room "No. 6," worked by one Owens, not the plaintiff. Prior to August 4, 1908, the work of timbering the entry had been carried forward to a point about halfway between the openings into rooms 6 and 7. From this place the roof was left unsupported to a point thirty or forty feet east of "No. 7," from which point Grange, the timberman, having called plaintiff to his assistance, began to set another series of supports. For this purpose they brought in timbers on a coal car, and under the direction of Grange, they had begun to unload them immediately east of the switch at the turn of No. 7, when a large mass of slate fell from the junction of the roof with the rib or wall of the entry, and plaintiff was caught in the fall and severely injured. He charges that his injury was occasioned by the negligence of the defendant in failing to provide him a reasonably safe place to work, and in failing to properly timber the entry, and that defendant, though having knowledge of the dangerous condition of the entry at that place, failed to warn the plain-

tiff thereof. The defendant denies the alleged negligence on its part, alleges that plaintiff himself was guilty of negligence contributing to his own injury, and that he assumed the risk of the conditions of the mine at the place in question, and is therefore not entitled to recover damages. Defendant further pleaded that, after plaintiff's injury and before this action was begun, the parties had an accounting and settlement, the result of which was that defendant undertook to pay, and did pay to, the plaintiff or for his use the sum of $136, and that he agreed to accept, and did, in fact, accept and receive, the same in full payment, settlement, satisfaction, and discharge of all his demands and rights of action on account of defendant's alleged negligence, and did then and there, in writing release the defendant from all further liability on account thereof. Replying to said plea of settlement, plaintiff admits the execution and delivery of the written acknowledgment of satisfaction set up by the defendant, but says the same was procured *from him by fraud and misrepresentation,* and he is therefore not precluded or estopped thereby.

I. In view of our final conclusion in the matter, we need only say, with reference to the merits of the case, that there are grave doubts about there being any showing of actionable negligence. The majority of the court are inclined to think there was no such showing of negligence on the part of the defendant as to take the case to the jury, and are also inclined to the opinion that the plaintiff assumed the risks and hazards of which he complains. Part of the work which he was employed to do was to assist in timbering the mine, and this he was engaged in when injured. A minority of the court think that these were jury questions and should have been submitted as such. We refer to the matter now for the purpose of showing that in any event there has always been doubt of defendant's

1. MASTER AND SERVANT: negligence: assumption of risk: evidence.

liability and of plaintiff's right to a verdict on the testimony, aside from the question upon which the case turns. This much in preparation for the controlling proposition in the case which we shall now consider.

II. On the 28th day of August, 1908, something more than four weeks after the accident, plaintiff made a settlement with the defendant and executed to it the following receipt and release:

## Form 373, 2 M, 607.

I, J. R. Owens, hereby admit and acknowledge that there has been paid to me in hand this day by Norwood White Coal Company the sum of one hundred thirty-six and 60/100 dollars in full settlement, accord and satisfaction of any and all claims or demands of every description which I now have or may hereafter have against the said Norwood White Coal Co. on account of an accident causing injury to me on or about August 5, 1908.

In testimony whereof, I hereunto set my hand and seal this 28th day of August, 1908. J. R. Owens [Seal.] Witness: C. Woodbridge, Mrs. J. R. Owens.

*Prima facie,* at least, this is a bar to his recovery. He pleaded in his reply, however, that defendant's agent and attorney falsely represented to him that he had no cause of action, and by his professed friendship and false pretenses of sympathy he won his (plaintiff's) confidence and induced him to sign the paper and accept the money, and that said attorney and agent falsely and fraudulently represented and stated to plaintiff that his (plaintiff's) doctor had stated to him (the said agent) that he (plaintiff) would be up and around within six weeks. He further alleged that he had no opportunity to consult counsel with reference to his case, and believing each and all of said statements to be true, and relying thereon, he entered into the contract of settlement which he

*2. Same: settlement and release: fraud: mental capacity: evidence: instruction.*

would not have done had he known the truth. He also pleaded a mutual mistake of the parties as to plaintiff's legal rights, and asked that the settlement be disregarded, and that the amount paid him be credited on whatever allowance the jury should make on his behalf. The testimony introduced on this issue tended to show that defendant's agent and attorney stated to plaintiff that he had no case, and that he would be a lucky man to take the money offered; that this agent, one Woodbridge, visited plaintiff about August 10, 1908, and had him make a statement of his case, and at the time "he asked Mr. Owens if he knew him, and Mr. Owens said, 'I suppose you are sent here by the company,' and he said, 'That is who I am.' He said, 'My name is Woodbridge,' and he said, 'Mr. Owens, I am going to do all I can for you,' and he says, 'I have gone where they will cuss and swear at me,' and he says, 'You have acted the perfect gentleman, and I am going to do all in my power, and I am going to try and get half of your wages while you lay here.' That was after he had talked with Mr. Owens. Mr. Woodbridge said where he goes they cuss and swear at him some places, and he said the company would rather give it to the lawyers than to give it to the man that cussed him."

The witness who gave this testimony (plaintiff's wife) further testified:

On his second visit Mr. Woodridge came with Dr. Cokenower who had been taking care of my husband. The two drove up together in a buggy. When Dr. Cokenower came in, he brought Mr. Woodbridge to the bed and said, 'Come here, and see that I am not holding this man here any longer than I can possibly help,' and he took care of his back, and put a new drainage in his back, and when Dr. Cokenower said that, Mr. Woodbridge came up and looked at my husband. After the doctor got through dressing the wounds, he picked up his satchel and walked out and sat in his buggy. Mr. Woodbridge then sat on a

chair alongside of my husband and told him he had heard from the company that the company had allowed him $75 all told, but he said, 'Mr. Owens, your hurt is deeper than I thought it was; I will do better than that on my own responsibility: I will give your hospital bill and doctor bill, and give you $50.' He said, 'Wait a minute and I will go and see the doctor as to how many trips he will have to make,' and he went out and came back and said, 'The doctor said he would have to make two or three more trips.' When Mr. Woodbridge came back in from the buggy he said, 'Your doctor bill is now close to $75 and he will have to make two or three more trips, and that will bring it close to $100. He charges $5 a trip.' My husband said, 'Well, I will think about it; I will think it over.' My husband was not then able to walk around. He could not move himself at that time. Mr. Woodbridge said, 'All right, you think it over, and if you decide on doing it, I will leave you my phone number, and you can call me up.' My husband asked him if he could not give him half his wages that he was getting, and he said, 'I can not do that because the doctor says you will be out of here and at work in six weeks.' Mr. Woodbridge said that after he had stepped out of the house and went to Dr. Cokenower's buggy. I could not hear what Dr. Cokenower said to Mr. Woodbridge. On this second visit, Mr. Woodbridge said to my husband that he had no case whatever; that he was an attorney himself, and was going to do all he could for him; that he had got word from the company, and that they had looked it up thoroughly, and he had looked it up thoroughly, himself, and he would take it on his own shoulders and give us more than the company allowed, and he said we had no case whatever. He said he was an attorney and claim agent. He said he had had experience as a claim agent for a long time, and had been out where people had been hurt in the mines. On that second trip my husband did not accept Mr. Woodbridge's offer. Mr. Woodbridge picked up his hat off the stand and started out and said, 'If you decide to do it, you can call me up,' and he left his phone number. After Mr. Woodbridge left, my husband and I talked over his offer. My husband has no education. During our married life he has done nothing but mining and timbering in the mines. Mr.

Woodbridge came to our house again when I phoned for him. We decided to take the $50 and have him pay the hospital bill and doctor bill. We thought if my husband got out and at work in six weeks we were doing pretty well, and my husband said, 'All right, you go and phone for him, and we will take it,' and I went and phoned. Mr. Woodbridge came when I phoned him. He was out there before I had time to get over from the home. Mr. Woodbridge came in and said, 'Mr. Owens, you are a lucky man, because you have no case whatever, and you are lucky to take this; you had better take this than to have nothing.' . . . I took care of Mr. Owens from the time he returned from the hospital up to the time Mr. Woodbridge made his third trip. Mr. Owens could not move himself. I had to move and help him. When I went to lift him or take care of him he would scream and holler with his leg. He could not be moved at all. He was in that condition at the time Mr. Woodbridge made his third visit. Mr. Woodbridge was out the second time on Monday, and it was either Thursday or Friday of the same week that he came out the third time and settled. It was either three or four days after the second trip that he settled up, on the third trip. Dr. Cokenower had not been at the house between those two trips of Mr. Woodbridge. He came the same day right after Mr. Woodbridge left. Up to that time Mr. Owens had not talked with any business man or lawyer about his case. Mr. Owens was in bed all the time. Mr. Woodbridge told us that if we went and got lawyers to see about it their lawyers would beat us out of it anyhow. That was on the second trip. . . . There were twelve days from the time he was hurt that he never moved a limb or shut an eye to sleep, and it was all of six weeks before he could use his limbs at all. He had not done any work since he was hurt.

This witness further testified on cross-examination:

It was during his second visit that Mr. Woodbridge first proposed to pay my husband $50 and the hospital and doctor bills. It was on that second visit also that he told my husband that he had no case against the company. My husband was in bed, and I was in the same room and heard the conversation. My husband did not accept the offer at

that time, but said he would think about it. Q. And then that was on Monday and your husband thought about it until Thursday or Friday? A. Yes, sir. He talked it over with me and decided to accept the proposition. We accepted it on Thursday or Friday, and the money was paid at our home, 854 Boyd street, in East Des Moines. . . . My mother and father live just across the street. My father was at the house when Mr. Woodbridge came over the second time. He was in the room and heard this conversation. One of the neighbors right across the street had a telephone. I used that telephone when I phoned for Mr. Woodbridge on the day he came and paid us. During the days of the week before he paid us I was taking care of Mr. Owens. It took most of my time. I could have gone over to my father's house during that time, had I wanted to. I went to the telephone myself and talked to a lady in Mr. Woodbridge's office. I was not at the telephone before during that week unless I phoned for the doctor. Oh, I did not phone for the doctor that week. He did not come out from the time Mr. Woodbridge was there the second time until Mr. Woodbridge came and paid the money. The doctor came right after Mr. Woodbridge went away. If I had had occasion to telephone, I could have done so any day that week. Neither Mr. Owens nor myself talked with my father about this settlement. We did not talk with any one. Did not call up any lawyer or talk to any lawyer about it. Mr. Woodbridge told us it would do no good to talk to a lawyer because we had no case whatever, and if we went and hired a lawyer that their lawyers—that is, his company's lawyers—would win the case for the company. That is about all he said about that matter. He tried to give us to understand we had no case, and that therefore we had better settle. We did not call up any business man or talk with any business man about settling. I did not go to the store during that week before the settlement. I could have gone, but I had no occasion to go. I was present when the settlement was made, and saw the receipt signed by my husband. He signed his own name to it. He can read and write. He can and does read the newspapers. He was not delirious or out of his head at all during that week before the settlement that I know of. When he was talking about this matter of this settle-

ment and about other matters he talked rationally as though he understood what he was talking about. He did not get out of his head at all. He was suffering agonies, but when he talked about things he talked sensibly as he ordinarily did.

And on re-examination she gave the following testimony: "I did not have any talk with Dr. Cokenower over the phone during that time between these two visits of Mr. Woodbridge. I did not try to have any talk with him. I never asked the doctor about this statement of Mr. Woodbridge's as to how long my husband would be disabled. I never thought about asking the doctor about what he had told Mr. Woodbridge."

Plaintiff himself gave this version of the matter:

They took me from the mine to my home and from there to Mercy Hospital. I remained in the hospital about four days. Went there on the 5th and left on the 9th, and after that stayed at home. They took me home in the ambulance. I was not able to sit up in a chair and be around when they took me home. I got home on the 9th, and on the 10th Mr. Woodbridge was there early in the morning. He came alone. . . . At the time Mr. Woodbridge came to see me, I was suffering untold pain. I was suffering with my kidneys and back, clean up to the back of my head here—all kinds of pain—and I was suffering in this knee here. It was fractured and swelled all up and gave me all kinds of pain. Most of the time I laid flat on my back. I could not stand sitting up too much. I could move the right limb a little, but the left I could not. I did not sleep well at night. I never slept at all for twelve days and twelve nights after I was hurt for the simple reason I was in all kinds of misery and my nerves were all shattered. When Woodbridge came to see me on the 10th of August he asked me how I felt. I told him very poorly. He said, 'Yes, I guess you do.' He says, 'Who does your doctoring?' I says, 'Dr. Cokenower,' and he said, 'I know him well; he does our doctoring.' He got to asking me how I got hurt, and I commenced to tell him the best I knew how, and he took out a pencil and paper and com-

menced writing down. He was sitting down in the chair. As I talked to him he would keep writing it down. I told him everything he asked me. I answered his questions as near as I knew how. After he had finished writing, he did not read the paper to me. He did not hand it to me to let me read it. He just stuck it in his pocket. I do not remember whether he got me to sign it or not. I do not remember whether I signed it or not. Q. Now did he mention anything about a settlement on the first trip? A. Why he said that I had acted a perfect gentleman with him, and that he was going to do all in his power to help me along. He was going to try to get me half of my wages. In most of the cases people was cursing and swearing around, and if they took the case to a lawyer and took it to court, why their lawyers would generally beat them. He did not advise me to go and consult a lawyer. He said if I went to see a lawyer I would be beat anyhow. He did not say who he was until he got everything wrote down, and then asked me if I knew him, and I said I did not unless he was a man sent there by the company, and he said, 'Yes,' he was sent there by the company. I believed these things that he told me because he was a lawyer and I was not. I had confidence in what he told me on that visit. He came again in about two weeks with Dr. Cokenower. I was still in about the same condition. I was suffering pain; suffered all that day because he went and put a drainage in my back while he was standing there looking. Dr. Cokenower and Woodbridge came into the house together. Dr. Cokenower said, 'Step up here and I will show you that I am not holding this man in bed any longer than I possibly can,' and he took the bandage off and started to work on my back, and called Mr. Woodbridge's attention to my back. He was where he could see it. After the doctor got through bandaging my back, he said, 'I will step out, Mr. Woodbridge, to the buggy, and you can go ahead and do your talking, and I will wait for you.' Woodbridge stayed in the room. Woodbridge said he had consulted with the company. They had found out that I had no case whatever, and he himself was an attorney, had been in the business a good many years, and had handled such cases as mine and found out that I had no case whatever. He said he had heard from the company, and they claimed I had no case.

He made an offer of settlement at that time. Woodbridge said the company had authorized him to give me $75 all told, but the condition I was in he would do better. He would make it better. He would take the responsibility on his own shoulders. He would pay my hospital bill and doctor bill and give me $50. He said he would take that upon his own shoulders. He mentioned that the doctor's charges so far were $75, and he said, 'I will step out and see the doctor and see how many more trips he has to make.' He left the room and stepped outside, and after awhile came back. He said, 'The doctor said he would probably make two or three trips yet.' That would bring the doctor bill up to $90 or $95. He said that the doctor said I would be up out of bed and at work in six weeks. He asked me if I was going to take the money. I told him 'No,' I would not do it, I would study over the matter. He said I had better take the money because I had no case to fight on whatever. He said if I would take it then, and after I got to studying over the matter he left his telephone number with me on a card and said, 'When you come to decide to take it, phone down to me and I will come right direct up.' . . . After Woodbridge left after the second trip, my wife and I discussed over the amount he wanted to give me. We decided that we had better take that than to get nothing at all. We could live on that $50 anyway, and by that time probably I would be able to be out and get to work again. I did not know how bad I was hurt. I supposed the doctor knew his business. Three or four days after Woodbridge's second visit, my wife telephoned him to come. He came. That was his third trip. He said, 'Mr. Owens, you are a lucky man that you sent for me to accept this money.' He said, 'You have no case at all.' He said, 'Furthermore, you will be out of bed in six weeks and at work.' I believed what he told me on that third trip, and relied on that in making the settlement and taking the money. He paid me $50. He said the doctor bill would be $90 or $95. I knew what the hospital bill was. It was around $15.50 or $16. Q. You never paid the doctor bill or hospital bill? A. No. Q. Do you know whether he did? A. Yes, he did. Up to the time I made the settlement with him and signed the release and took the money, I relied upon all the statements made by Woodbridge to me. I

would not have made the settlement and taken the money had he not made those statements. I did not distrust him. . . . I recognize my signature to the paper marked 'Exhibit 3.' That paper also bears my wife's signature. I saw her sign it there. I saw my wife sign it, and I signed it. I can read the paper Exhibit 3, both the written and printed parts of it. I do not have much difficulty in reading it by taking my time to it. The printed part of it is large and clear. Exhibit 3 bears date August 28, 1908. I believe that is the date when I signed it. Mr. Woodbridge did not hand Exhibit 3 to me. When I signed it, it was off of the bed on a chair. I was lying on my back. I do not know whether the written parts were filled in it or not when I signed it. I did not see whether it had my name, J. R. Owens, written at the top, nor the words 'Norwood White Coal Company.' I could not swear whether those things were written in or not. I suppose the sum $136.61 was written in there at the time I signed it. I have no reason for thinking that those things were not written in there at the time I signed it. I have no doubt but that the written parts of Exhibit 3 were all in it when I signed it. Q. That is what you were receipting for? A. I signed it, yes. Q. For the injuries you received August 5, 1908? A. For the money I received from him. . . . This settlement was made on the 28th day of August. Mr. Woodbridge did not read over the release, Exhibit 3, to me. I did not ask him to. My wife did not read it to me. I did not ask her to. I got the benefit of the whole $136.60 in settlement. He did not frog me on that part of it. I did not try to read the receipt myself that day. There were three or four days intervened between the time when Mr. Woodbridge offered to make this settlement and the day it was made. At the time Mr. Woodbridge made the offer and I told him I would think it over, my father-in-law was present. He heard Mr. Woodbridge's offer. I did not talk it over with my father-in-law at any time, but I talked with my wife. My father-in-law was an old coal miner. He was an old hand at it. . . . I never did talk that matter of settlement over with my father-in-law. That was my business. I thought I was treated right and that I had a friend. I thought Mr. Woodbridge was my friend. Yes, I knew he was representing the company and was

looking after its interests. I did not know that he was trying to get out of the matter so that it would not cost the company a great deal of money. I guess my common sense did not teach me that. He said he was a friend of mine and he was going to do everything possible for me. I had never seen him before he came out there on the 10th of August. Never had any acquaintance with him before that. On that day he was there probably an hour and a half. That was the time when he got this statement signed up. About all that was done there that time was his writing down this statement and then leaving. He did not make any offer of settlement the first day. He came out there again two weeks afterwards. That time he came with the doctor. He was there probably half or three-quarters of an hour, and about twenty minutes of that time the doctor was not in there. The next time I saw Woodbridge was the time he paid me the money. I suppose he was there about fifteen minutes before I signed this receipt. These were the only times I had ever spoken with Mr. Woodbridge. These were the only times that I had ever seen him in all my life. I knew he was a representative of the company, and was representing the company's interests. That was the extent of my friendship and acquaintance with Mr. Woodbridge. Yes, I knew that this was a receipt in full. I knew that it didn't leave me any right to claim anything against the company. I accepted this at that time as a full settlement on account of the injuries that I had received. That is what I intended to do at that time. He said I had no case. There were three or four days intervening between the time when Woodbridge made me the offer and the time I accepted it and signed the receipt. Those days were along the 24th, 25th, 26th, and 27th of August. Dr. Cokenower was not there to see me during that time. I heard him testify that he was out here during that time, but he was not. I heard him swear that he was. I did not at any time ask Dr. Cokenower what he thought about when I would be able to get up and go to work. I never asked him the question. I was not curious to know what he would say about it. I never got my wife to telephone him about it. Never sent my boy to see him and ask him that question. I never made any effort whatever to inquire of Dr. Cokenower himself as to how long I would probably

be disabled. There was nothing to prevent me doing so. At the time of the settlement I had heard of other men being injured and bringing suits to recover damages. I knew that there was such a thing as a court and jury to try that kind of case. I knew that sometimes the verdicts were one way and sometimes the other. Q. And so, when Mr. Woodbridge told you that you had no case you knew he was simply expressing his opinion about it, didn't you? A. No, he said he looked it up. Q. You knew the other side might look the other side up? You knew some one might look your side up, didn't you, if you had asked them to do it? A. I believed what he said. I knew I could get a lawyer to look up my side of the case, but I did not do it; did not try to do it. There was nothing to prevent my wife telephoning a lawyer. Nothing to prevent me sending for one. I had all the opportunity in the world between the time Woodbridge made the offer and the time he paid me the money, if I wanted to. There was nothing to prevent my doing so. I had had a physician in my family before this. Some one called Dr. Cokenower this time when I was hurt. He was my family doctor, and he had been before that. I do not know who called him this time. . . . Q. Did you talk with Dr. Cokenower between the second and third trips? A. No, sir. Q. What, if anything, prevented you from consulting a lawyer about your case before you settled? A. Well, Mr. Woodbridge said, if I went and consulted a lawyer and brought it into court, their attorneys would beat me anyhow, so I did not see that there was anything for me to do. I did not think that there was any necessity or use of seeing a lawyer. I was on my back in bed. My wife was there in attendance on me. My mother-in-law would come over sometimes and my sister-in-law would come in and help take care of the children. We had no nurse.

This is practically all of the testimony as to the inducements offered plaintiff to settle and to prove their falsity. Plaintiff, of course, claims that his testimony made out a case against the defendant, and he introduced testimony showing the nature and extent of his injuries, which were in fact serious and doubtless permanent, and

in addition to that he produced Dr. Cokenower as a witness. Dr. Cokenower who, it is conceded, was plaintiff's physician, and in no manner represented the defendant, nor was he employed by it, testified substantially as follows:

I remember Mr. Woodridge riding out to Mr. Owens' place in the buggy with me one day. After I got through attending Mr. Owens, I went out and got in the buggy. Mr. Woodridge came out with me, but later went back into the house. Q. Did you, when Mr. Woodbridge came out from the house, tell Mr. Woodbridge that Mr. Owens would be up and at his work in six weeks? A. I did as far as the hematoma was concerned, unless some new complications arose. Q. Tell what you told Mr. Woodbridge when he came out from the house. A. Just as I stated then. Q. Did you ever tell Mr. Woodbridge or any one else that Mr. Owens would be up and at his work in six weeks? A. No, sir. I might qualify that, just as I did before, that so far as the tumor was concerned he ought to be over that in six weeks unless some complications arose or new developments, because this was before the six weeks was up that I stated this, and any one to make a statement that a person would be able to go to work after the injury at a specified hour, he was certainly ignorant or dishonest. That would be all I would say, I do not care who he would be. . . . I could not say positively how many visits I made to Owens' place in company with Mr. Woodbridge. It would be guesswork. I recall the occasion of his asking me as to the probable period of time during which Owens would be disabled, as that was the only occasion when he returned to the house. I have a record of my visits to Mr. Owens. I would say that my statement to Mr. Woodbridge was made more than two weeks prior to the termination of the six weeks from the date of the injury. That would make the statement of Mr. Woodbridge about four weeks after the injury. I made a number of visits after that. Four or five days after that I visited Mr. Owens again. I stated to Mr. Woodbridge at that time what I thought with reference to the prognosis or outlook for his man Owens. Q. What was it you said, just repeat that? A. I said that so far as the tumor was concerned that it ought

to be well in six weeks unless complications arise or something else develops.   Q. Were you at that time, at the time you made that statement, anticipating any complications? A. I was not although I know that there was some trouble with the hip, but I did not know just exactly to what extent or how long it would be.   I recognize the writing, Exhibit 1, as being in my handwriting.   That is the report I made as attending physician in Mr. Owens' case to Mr. Woodbridge.   The written words in Exhibit 1, 'disabled about six weeks, mostly from left thigh,' after the printed words, 'future prospects,' are in my handwriting.   That was my judgment of the probable future prospects of Mr. Owens' injury at the time I made that report.   I do not remember the date when I made out the report Exhibit 1. That report, Exhibit 1, was my professional judgment of Mr. Owens' condition at that time.   The fact that the report, Exhibit 1, is not signed by me is the result of oversight.   I am ready to stand for the statements the same as though the paper had been actually signed by me.   Every statement that is made there was true at that time, but that was before the six weeks had expired. . . . There were no bones broken or fractures in Mr. Owens' case. There was no complete dislocation.   There was an injury to the hip, but the swelling was so large that it was not dislocated but simply damaged.   I have no record of a visit to Mr. Owens after the 31st of August.   I took care of him as long as I deemed it necessary.   I then discharged him as a patient, simply because I thought all that he needed was rest and quietude, and that he could get without my presence. . . .   This statement, Exhibit 1, was not made before Mr. Woodbridge made his last visit with me to Mr. Owens, nor was it made before he took his first trip with me.   The statement was made after he had made his last trip there with me.   This journal, from which I have taken the dates of my visits, is in my handwriting.

The exhibit referred to by the doctor was his report as surgeon, which is in the following language:

### Surgeon's Report.

Case of J. R. Owens, residence, 854 E. Boyd St. Injury at Norwood mine.

Date of accident, Aug. 5, 1908; examination, Aug. 5, 1908.

Physician, James W. Cokenower.

Diagnosis, lumbar blood tumor, 3 pints, due to injury, bruised left thigh and hip and right knee.

Prognosis, favorable.

Age, 39 years; weight, 140 lbs.; height, 5 ft. 7 in.

Previous history, negative.

Nature of accident.

Direct effects.

Indirect or subsequent results.

What work since accident.

Examination.

Future prospects, disabled about 6 weeks; mostly from left thigh.

Remarks.

[Sign here] ——————, M. D.

This is practically the entire testimony introduced by plaintiff in support of the issues tendered by his reply in response to the plea of settlement. Some of it is disputed by defendant's witness, Woodbridge, and with reference to one of the issues he said:

On the 21st day of August I told Mr. Owens the doctor told me he would be disabled about six weeks, and Mr. Owens said, 'I do not believe it.' And I said, 'He is sitting out there in the buggy; call him in here, and ask him,' and he said, 'No; I do not mean I do not believe you when you say he said it, but I think he is mistaken,' and I said, 'I do not know anything about that.' The doctor had told me coming over to Mr. Owens' house in the buggy that he would be disabled about six weeks. I went over to the doctor's office, or started over to get him to make out this report showing the man's condition, and when I got over to the door of the building I met Dr. Cokenower coming out and told him what I wanted and that I was going over there, and he said he was just on his way there, and for me to get in and ride along with him; and on the way over there he told me that in his judgment Mr. Owens would be disabled about six weeks, and when we came back from Mr. Owens' house the doctor went up to his office and filled

out that blank. That was on August 21, the date when I first made the offer of settlement to Mr. Owens. The blank which he filled out was Exhibit No. 1. I saw the doctor make it up. He delivered it to me. I have no knowledge or skill in medicine or surgery, and at the time I made this statement to Mr. Owens I had no knowledge or information of any sort that led me to question or doubt the correctness of the statement that the doctor made me. I only knew what he had told me. The doctor had told me, in substance, the same thing that he afterwards wrote in this report. What I told Owens was what the doctor had told me, namely, that the doctor said he would probably be disabled about six weeks. The day I rode over with the doctor, as he went out he said he would be back Tuesday, as I remember it, and the day I settled with him I asked Owens if the doctor had been there since I was there, and Owens said, 'Yes,' and I asked Owens, 'Did you ask him about the disability?' and Owens said, 'Yes, and he said just as you said, that I would be laid up about six weeks,' and Mr. Owens added, 'I think yet it will be longer than that.'

In rebuttal of this plaintiff testified as follows: "I heard Mr. Woodbridge's testimony. I had never talked with Dr. Cokenower prior to the time of this settlement regarding the length of time I would be sick. Q. How long after you received that money was it that you had any talk whatever with Dr. Cokenower about the extent of your injury? A. It was about four months."

It has seemed necessary to either set out the testimony bearing upon the issues tendered with reference to the settlement in order that the matter may be fully understood or to simply announce our conclusions with reference to the matter, leaving it to the profession to hunt out the testimony in the record in the event it became necessary to know the exact nature of the evidence upon which our conclusion is based. In view of our final conclusion, it is deemed best to adopt the former method in the writing of this opinion.

The trial court in its instructions, with reference to the matters here at issue, said:

(10) If you find from the evidence that, at the time the plaintiff signed the release in controversy, he did not read the same, and you further find he was suffering with pain and that he was mentally unfit to transact business, and that the defendant made use of the statements and representations that he would be well and at work within six weeks from that time, and that the doctor had so informed him, and you further find that the plaintiff was induced by such statement to sign said release, and you further find that the statement, if you find it was made, was not true, and that it was made by the defendant through its agent and attorney for the purpose of inducing the plaintiff to sign said release, and that such statement did induce him to sign such release, then and in that event you would be justified in finding that said release or receipt is void; but, unless plaintiff has so established by a preponderance of the evidence, then said receipt would not be void and would be binding upon plaintiff, and you should return your verdict for the defendant. (11) In considering the question as to whether or not the said receipt was obtained by fraud, you will consider the surroundings and condition of the plaintiff at the time the same was signed, whether he was in that mental condition that he was capable of understanding and realizing the nature and effect of the same, whether defendant made use of any artifice or statements that were untrue and of a nature to deceive and mislead plaintiff, and from these and all other facts and circumstances, that you may find are established by the testimony in the case you are to judge whether or not the release or receipt in controversy is binding upon the plaintiff. And if you find from the evidence that said release was obtained by such fraud, then plaintiff is not bound thereby, and the same is no defense in this case. The statement that plaintiff had no case and could not recover damages from the defendant is merely an expression of an opinion, and would not be the basis of fraud, and you could not so consider it in arriving at the question of whether a fraud was committed. If, under the evidence and the foregoing instructions, you find that said receipt and release is void,

then you will proceed to consider whether or not plaintiff is entitled to recover upon the main branch of the case as set out by him.

By this instruction Woodbridge's statements that plaintiff had no case and could not recover were eliminated, and the jury was confined to but two propositions: One plaintiff's mental incapacity, and the other the representations as to the time within which plaintiff would recover.

These instructions are not entirely clear; but it is manifest we think that a jury would have been authorized thereby to disregard the settlement in the event it found plaintiff did not have sufficient mental capacity to understand or realize the nature and effect of the same. In this respect we think the court was in error. There was no testimony tending to show plaintiff's mental incapacity at the time the settlement was had and the receipt executed. Had the jury been directed to consider plaintiff's mental condition in arriving at the effect which Woodbridge's statements as to the time when he might expect to recover had upon him, there might be some ground for sustaining it. The trouble here is that the plaintiff himself testified that he fully understood and comprehended the effect of the statements and relied thereon with a full understanding of what they implied. He did not excuse his act by saying he was either in want or in pain, or that his condition of mind was such that he did not fully understand all that took place. In submitting this matter to the jury, we think the trial court was in error.

As to the other proposition, to wit, whether or not Woodbridge made any false or fraudulent statements regarding what the doctor told him as to how long he (plaintiff) would be in bed, the members of the court are not agreed. A majority are of opinion that there was not enough testimony here to take the case to the jury. The doctor was plaintiff's own. He was not in the employ of the defendant, either generally or specifically. It is con-

ceded that Woodbridge inquired of the doctor as to the
nature of plaintiff's injuries before making any statement
to him (plaintiff) as to the probable nature, extent, and
duration thereof, and it appears to the majority that he
(Woodbridge) did no more than to repeat the substance
of what the doctor said to him.   The doctor himself,
answering a question catagorically, said that he did not
make the statement which Woodbridge repeated to plain-
tiff, but he qualified this statement in such a way that a
jury must have found that he did in fact make substantially
the same statement which Woodbridge repeated to plain-
tiff, save such verbal inaccuracies as naturally arise in
trying to repeat a statement made by another.   In the
opinion of the majority there is no testimony whatever
that would justify a finding that Woodbridge concealed
anything from the plaintiff, or that he intentionally or
fraudulently made any misstatements in his attempt to
repeat what plaintiff's own doctor said to him regarding
plaintiff's case.   True, the doctor was mistaken, but he was
plaintiff's own choice, and Woodbridge did no more than
attempt to state what the doctor told him.   He offered
no opinion of his own, and did not profess to have any
knowledge of the subject.   In addition to this, there is
testimony in the record, undenied by plaintiff, to the effect
that he (plaintiff) did not rely upon this statement, but
said himself that he believed that he would be laid up
longer than the time fixed by the doctor.   Moreover, ac-
cording to plaintiff, the statement as to what Woodbridge
said the doctor stated to him was made some three or four
days prior to the time the settlement was had, and plain-
tiff did not, as he says, see fit to inquire as to whether or
not his doctor had made any such statement.   True, he
says that he did not see the doctor in the *interim,* but the
doctor says he did see plaintiff.   However this may be,
it is conceded that plaintiff's wife was in communication
with the doctor and could easily have reached him at any

time by phone, and that nothing was done in this direction. The settlement was not hastily made. It was under consideration by plaintiff and his wife for many days, and some of the testimony indicates that relatives were also counseled. However this may be, one of the relatives, an experienced miner, was present when Woodbridge made his first proposition of settlement, and, if he did not advise the settlement, he certainly offered no objections thereto.

For all time the law has favored the settlement and adjustment of controversies, and when fairly made and uninfluenced by fraud or false representations, or overreaching, they should be upheld.

3. SAME: compromise and settlement.

Of course, where such settlements are made with injured and necessitous persons who have not had the aid of counsel, they should be closely scrutinized in order that one who is liable may not profit from his own fraud or wrong. But when fairly and intentionally made, especially where, as in this case, the claim is, to say the least, doubtful, they should be upheld. It is entirely competent for persons of sound mind to make such contracts as they will, and the law does not undertake to act as guardian for every one who is injured in the matter of making settlements with the party who is responsible therefor. It will see, however, that no undue advantage is taken of one who may be in a badly injured and necessitous condition, and do everything in its power to avert the consequences of fraud and misrepresentation.

Every one, no matter what his injuries, has a right to settle the damages resulting from the negligence of another, and it is not for the courts to either deprive him of the privilege or to relieve him of the consequences thereof simply because he was mistaken as to the nature and extent of his injuries. Our conclusions here find support in the following, among other, cases: *Rauen v. Insurance Co.*, 129 Iowa, 725; *Kilmartin*

4. SAME:

*v. Railroad Co.*, 137 Iowa, 64; *Nason v. Railroad Co.*, 140 Iowa, 533; s. c., 149 Iowa, 608; *Douda v. Railway Co.*, 141 Iowa, 82; *Blossi v. Railroad Co.*, 144 Iowa, 697; *Johnson v. Railroad Co.*, 107 Iowa, 1. In this connection it should be stated, however, that the case differs from some of these relied upon by appellant which hold that an erroneous opinion of an attending physician as to the nature, extent, and probable duration of an injury can not be made a ground for setting aside a settlement; in this that Woodbridge was not a doctor and was not undertaking to give his own opinion, but was attempting to repeat a statement said to have been made to him by plaintiff's own physician, and if he falsely and fraudulently misrepresented what the doctor said to him, and plaintiff believed his statements to be true and acted thereon, this would amount to such a fraud as would nullify the receipt and settlement. The difficulty in the case is to find any false or fraudulent statement made by Woodbridge, or any reliance upon whatever statements were made. Again, there is nothing, as the majority think, to show any material misstatement of what the doctor said. The difference of opinion between the majority and the minority is not so much as to the law but as to whether or not there was a question here for a jury. On one proposition—that is to say, there being a lack of testimony to show mental incapacity—we are all agreed, however.

It follows that, for the reasons pointed out, the judgment must be, and it is,—*Reversed.*