A. H. CLARK, Appellee, v. CHICAGO GREAT WESTERN RAILROAD
COMPANY, Appellant.

**MASTER AND SERVANT:** Operating Train—Application of Brakes
1   —Failure to Warn—Rules—Custom—Negligence.   Evidence and
instructions briefly reviewed and held to present a jury question
whether defendant was negligent in the manner in which the
brakes were applied to a train, and whether warning of such ap-
plication was required (a) by rule or (b) by custom.

**MASTER AND SERVANT:** Federal Employers' Liability Act—In-
2   terstate Commerce—Use of Track—Submitting Question to Jury.
The Federal Employers' Liability Act authorized an action there-
under only when both carrier and the employee are engaged
in interstate commerce.  *Held,* carrier was engaged in such com-
merce over the track in question, though such track was not
fully completed.

PRINCIPLE APPLIED:  Plaintiff's duty as trainmaster was to
be out upon the road from Oelwein, Iowa, to Chicago, supervising
matters in general.  At the time of his injury, he was super-
intending the laying of gravel on the track.  The track was
newly constructed and not fully completed.  It had not been
bulletined for use, but on both of the two days preceding the
injury, it had been used to store two interstate trains, at least
one of which proceeded over the line.  The track had been put
to no other use except for work trains.  *Held,* (a) the defendant
was using the track for interstate commerce, and (b) it was not
improper to permit the jury to say whether the laying of the
gravel was being done in the maintenance of a roadbed used in
interstate commerce or in the original construction of the track.

**RELEASE:** Mental Capacity—Evidence Reviewed—Master and Serv-
3   ant.  Evidence reviewed and held to show that one who had
signed a release was under no mental disability at the time of
signing.

**RELEASE:** Consideration—Payment of Lost Wages—Re-Employ-
4   ment.  A release of all claim for personal injury, in consideration
of being re-employed and paid for lost time, is supported by a
sufficient consideration.

*Appeal from Dubuque District Court.*—J. W. KINTZINGER,
Judge.

TUESDAY, MAY 18, 1915.

ACTION for damages resulted in verdict and judgment as prayed.    Defendant appeals.—*Reversed.*

*Carr, Carr & Evans* and *Geo. T. Lyon,* for appellant.

*Mathews & Chalmers* and *Geo. A. Barnes,* for appellee.

LADD, J.—The injury complained of was received near Stockton, Illinois, and the petition claiming damages is in

two counts, the first declaring the defendant liable in consequence of the negligence of its engineer under the provisions of the Act of Congress, approved April 22, 1908, known as the Employers' Liability Act, and the second under the common law.    The latter was withdrawn from the jury on the ground that "defendant company is not liable for injuries received by one of its employes through the negligence of his fellow servant in the state of Illinois."

The defendant's line of railway extends from Chicago through Byron, East Stockton and Stockton on to Dubuque and through Iowa.    East Stockton is about one and one-half or two miles east of Stockton, and Kent is about the same dis-

tance east of East Stockton. The plat will indicate the construction of the line at and between these several places.

A train came from the east on the east main track to one of the cross-overs indicated on the plat, in order to reach the west main line, and this west main line is disconnected from the line immediately east of it.

On the 18th day of November, 1910, the train crew picked up a train of 25 or 26 cars of gravel at Byron, some 40 miles east of Stockton, and moved it westerly until reaching the west main line, and, cutting off the caboose, shoved the cars on a sidetrack. In the morning of the 19th, they took the engine and caboose from Stockton to East Stockton, and going to the yards got what is known as a plow car and seven cars of gravel, took them to the west main line, and, after going west, backed the same to a point near the semaphore and unloaded some of the cars on the track. The gravel fell from the ''V'' shaped bins to the middle of the track and the plow car coming behind leveled this off. On backing to unload at another place toward the east, with the plaintiff standing on the plow car near the sand box (a sand box three or four feet high was at each end), the conductor and possibly the brakeman gave the engineer a signal to ''slow down.'' As the engineer applied the air to the brakes, the plow car jerked and threw plaintiff from the car across the rails below and he was seriously injured.

I. But two grounds of negligence were submitted to the jury: whether defendant was negligent (1) in the manner of applying the brakes in response to the slow down signal given by the conductor and brakeman, and (2) in failing to sound the whistle twice as a warning before applying the brakes. Appellant contends that the evidence was insufficient to support either. Though alleged as distinct grounds, the court in the seventeenth instruction said that ''the only questions of negli-

1. MASTER AND SERVANT: operating train: application of brakes: failure to warn: rules: custom: negligence.

gence, if any, submitted to your consideration are the allegations of defendant's negligence in carelessly and without warning causing the air to be applied on the engine so severely and suddenly that the speed of the engine and train was checked so suddenly and violently as to throw the plaintiff from the car on which he was riding''; and in the twenty-fourth instruction, the jury was directed that in order to return a verdict for the plaintiff it must find that defendant's employees checked the speed of the engine and train with unusual force and violence; or that under a rule of defendant or in accordance with the customary practice, the engineer upon receiving a signal to slow down when on the line, should respond before doing so with two short blasts of the engine whistle, and that he omitted so to do, and that because of such failure to give warning and the sudden and violent jerk of the train in slowing down, the plaintiff was thrown from the cars and injured.

In the twenty-fifth instruction, the jury was told that if such were not the rule or custom, or if the two blasts were sounded, or if there was no unusual and violent jerk the verdict should be for defendant. If such were the customary practice, then the plaintiff might have been found to have had the right to rely upon the signal before there would be any jerk from the service application of the brakes, and even though there may not have been sufficient evidence to show negligence in the manner of applying the air, the jury might well have concluded that, in so doing without warning, the defendant was negligent. True, a witness testified that there was no such rule, but as plaintiff had testified there was, this merely put the existence of such a rule in issue. One was introduced reading that ''when a signal (except a fixed signal) is given to stop a train, it must be acknowledged as prescribed by Rule 14 (G).'' Rule 14 required that two blasts shall ''answer to any signal not otherwise provided for.'' What is meant by a ''fixed signal'' is nowhere explained, and, moreover, the existence of the printed rule did not obviate

a finding by the jury that a response in the manner stated to a slow-down signal was not the customary and usual practice when working out on the line. We are of the opinion that the issue as to defendant's negligence as submitted was for the jury.

II. The court instructed the jury that, as the injury was in consequence of the negligence, if any there was, of a fellow servant, recovery might not be had unless the plaintiff as

2. MASTER AND SERVANT: Federal Employers' Liability Act: interstate commerce: use of track: submitting question to jury.

well as the defendant was engaged in interstate commerce. Appellant contends that there was no evidence that the track, when the gravel was being placed, was being used in interstate commerce. Plaintiff's duty as trainmaster was "to be out on the road, keeping things moving, keeping the trains moving, seeing that the men were doing their work right and proper and anything that might come up." He was then devoting most of his time to the railway between Stockton and Byron in Illinois, on account of the congestion of business there; but his employment extended from Oelwein, Iowa, to Chicago, Illinois, and he was acting under the direction of the superintendent, as his representative. Though the west bound track had not been bulletined for use on November 17, 1910, a freight train tied up on the east end of it and, as was testified: "They had orders to tie up there under the sixteen-hour law, and they had backed down and put their train in there on that track; they used the middle cross-over to get in on the west main track; used the one opposite the East Stockton depot; they put their train on the east end of the west bound main line; stayed there till the rest was up, about eight hours, and then pulled out on the west bound track to Dubuque, I presume; the destination of that train was Oelwein. A train also tied up on the 18th at Stockton on the east end of the west bound main on that part of the track east of the middle cross-over at the East Stockton station." Thus this identical track had been actually devoted to the purposes of interstate commerce

on two occasions immediately previous to the accident, and the evidence also disclosed that it had been made use of for no other purpose. As plaintiff was trainmaster and the representative of the superintendent in actual charge of the construction of the new track, it is to be inferred that he was authorized to determine when so far completed as to be ready for use and to direct the use to be made thereof, and he so did. He testified that the train crew had attached the engine to the cars of gravel and hauled them "up to where the semaphore used to be and unloaded part of the cars on the west bound main track. The engine was headed west. I was on the train when they left East Stockton for Stockton; rode up to the semaphore and stopped there. I should judge that semaphore was about one-third of the way from Stockton to East Stockton. When we got there we unloaded three or four cars to patch up the main line. It was my business to show them where to put the gravel. I don't know whether that line marked as 'west main line' between East Stockton and Stockton was bulletined for service or not, but it had been used; was used on the night of the 17th for the purpose of storing the train; the crew asked me where they should put their train,—they had orders to tie up at Stockton—and I told them where to put it because the other tracks were full of gravel; when the engine and six or seven cars and the plow car reached a point near the semaphore I got off the train, walked along and told them how much gravel to let out so it would not flood the rails; I walked along that way during all the time they were unloading. After we had unloaded all that was required at that point, I got on the train and started back for East Stockton, I got on my ladder at the east end of the plow car. The plow car is an ordinary flat car with sand boxes on each end of it over the trucks and the plow in the center, double plow pointed up to a point to throw the gravel off the track. There was a crank to raise and lower the plow; when the plow was working it laid right down on the track and the shoe of the plow scooped off a space of six inches

inside about an inch and a half below the ball of the rail. When it was not in operation there were two to four inches from the bottom of the plow to the top of the rail. We had been distributing considerable gravel in the new yards that day that is where the gravel was needed.''

Other evidence of similar character was adduced. The defendant was engaged in interstate commerce over this line of railway; it had used this particular track on which to store at least two trains actually bound from points in Illinois to Oelwein, Iowa; the construction had been sufficiently completed for that purpose and what was being done might well have been found to be merely leveling the grade and filling up depressions therein for continued use in interstate commerce. Certainly the jury might have so found under the evidence, rather than that what was being done was a part of the original construction of the roadbed disconnected from its use; and if so, there was no error in submitting to the jury whether what was done was in the maintenance of the roadbed being used in interstate commerce or in the original construction of the same. If the former, then plaintiff was engaged in interstate commerce at the time of being injured and must recover, if at all, by virtue of the so-called Employers' Liability Act of Congress. *Pederson v. Ry.*, 229 U. S. 146.

III. The defendant pleaded the execution of a release dated February 2, 1911, from ''all claims, damages, actions, causes of action or suits at law for ·or because of any matter

3. RELEASE: mental capacity: evidence reviewed: master and servant.

or thing done, omitted or suffered to be done by said company, its agents or servants'' up to the date of the release. In reply, the plaintiff alleged, first, that the release was procured by fraud in that Dr. Davis, the defend-

ant's surgeon, represented to plaintiff that nothing ailed him except a difficulty with his nerves, and recommended that he resume employment with defendant and mingle with his former associates and that this would likely cure him; that he so did in reliance upon said physician's recommendation and

signed said release in reliance thereon; that the statements of the said physician were false, known to be false by him and made with the intention of inducing him to execute the release mentioned.

In addition to this, the plaintiff alleged that he was incapable at the time of signing the release to execute a valid contract. The trial court declined to submit the issue of fraud raised by the reply, and as plaintiff has not appealed, we have no occasion to pass on that ruling, (see however *Haigh v. White Way Laundry Co.*, 50 L. R. A. (N. S.) 1091, and cases collected in note); but did submit the question as to whether the plaintiff was capable of and did appreciate the conditions of the release. Appellant contends that the evidence is insufficient to show that the plaintiff was unable to comprehend what he did at the time of executing the release. The plaintiff testified:

"I have heard of the rule that employes are required to sign releases before they return to work; I knew there was such a rule. In a general sense I knew what a release was. Dr. Davis told me at the time Mrs. Clark was with me that there was nothing the matter with me but the nerves and in order to get well, I must go back among the men, get back among my old associates and forget it, told me the only way I would improve would be to get among the men and forget it, get it off my mind. I told Mr. Causey what Davis had told me when I went to report for work, told him the doctor said I would get well faster if I went to work. Mr. Causey told me I would have to sign a release. I don't know as I said, 'I know it,' but I might have said I suppose so, or something of that kind. I knew the nature of the paper I would have to sign was termed a release. I cannot say that Mr. Causey told me anything I didn't already know, when he told me I would have to sign a release. Then he said he would pay me for time lost, and I responded 'very well' or words to that effect. That is all the conversation I had with

him.   There was no talk about any payment in the future; the only thing I remember was speaking about my eyesight and hearing and he told me that wouldn't be held against my physical examination.   So far as my receiving any more pay if I didn't get well as the doctor thought I would, there was nothing said, either by me or by Mr. Causey about receiving any additional compensation.   .   .   .   There was no indication to me that if I did not get well I would be entitled to any more.   According to the doctor's report to me, there was nothing to get well only the nerves; I felt some pain and felt I had not been improving as fast as I should; I did not feel I was already well, knew I was not well when I went to talk to Mr. Causey.   The doctor told me it was the only way I would get well; I knew I was not well at the time. .   .   .   I did not read the release when I signed it, did not pay much attention to it, I knew I had to sign it, so I just signed it without looking at it.   The instrument, defendant's 'Exhibit A,' is the release I signed in the superintendent's office, that is my signature.   I could read at the time I signed that release.   I think I stood up and signed it on a table; it was handed to me by Mr. Johnson's clerk.   .   .   .   I talked over with Mrs. Clark the matter of going back to work and if I remember right, she did not want me to go to work; we often talked over the advisability of taking Dr. Davis' advice and returning to work; as I remember she protested against it, protested against my signing anything; told me, after the conversation with Dr. Davis in which he referred to signing up, not to sign anything, and protested against me doing it. She asked me when I went to work, not to go, regardless of what the doctor said.   The day I reported she requested me not to; she warned me not to sign anything.''

The superintendent and the clerk present testified that they noticed nothing out of the way with plaintiff at the time of signing the release.   That Davis had prescribed certain pills for him to take in order to relieve him from pain

is not disputed, but there is no evidence that the effect of these pills was to impair his intellect, and we have been unable to discover any testimony which tended to indicate that he was mentally incapable. Undoubtedly he had suffered severe pain and his wife had insisted that he should not sign a release, but this with his testimony falls far short of establishing inability on his part to comprehend what he was doing. See *Owens v. Norwood Coal Co.,* 157 Iowa 389; *Oakes v. Ry.,* 157 Iowa 15; *Nason v. Ry.,* 149 Iowa 608.

The defendant, on receipt of the release, paid plaintiff for the time since being injured at the same rate of compensation as before, and employed him as conductor, when, but

4. RELEASE: consideration: payment of lost wages: re-employment.

for the execution of the release, it would not have done so. Such payment and employment, contrary to appellee's contention, constituted a sufficient consideration for said release. It follows that the court erred in submitting to the jury the issue as to plaintiff's mental capacity to execute the release, and because of this error the judgment is—*Reversed.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.