## CHICAGO JUNCTION RY. CO. v. KING.

### (Circuit Court of Appeals, Seventh Circuit.   February 3, 1909.)

### No. 1,520.

1. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—VIOLATION.

Under the provision of the safety appliance act (Act March 2, 1893, c. 196, § 2, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), making it unlawful to haul any car used in interstate traffic not equipped with automatic couplers, and which can be uncoupled without the necessity of men going between the ends of the cars, where such a car having a broken coupler could reasonably have been repaired where it stood on a switch track, the mere fact that it could be repaired more conveniently at another place did not justify its being moved in its defective condition.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

2. MASTER AND SERVANT (§ 234*)—RAILROADS—SAFETY APPLIANCE ACT.

The protection given to railroad employés by the safety appliance act (Act March 2, 1893, c. 196, § 2, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), requiring cars to be equipped with automatic couplers, is not limited to employés injured while coupling or uncoupling cars, but extends to a switchman who was injured as a direct result of the movement of a train containing a car with a broken coupler while, acting within the scope of his duty, he was between the cars engaged in replacing the broken part, and he cannot be charged with contributory negligence because of his so going between the cars with knowledge of the defect.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 706; Dec. Dig. § 234.*]

8. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—VIOLATION.

The duty of seeing that no cars used in interstate commerce are hauled by a railroad company unless equipped with the required safety appliances is imposed by the statute on the company, and cannot be evaded by delegating the same to the conductor of a train or other employé whose action in that respect is that of the company.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

4. MASTER AND SERVANT (§ 201*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE OF FELLOW SERVANT—NEGLIGENCE OF FELLOW SERVANT.

That the negligence of a fellow servant contributed to the injury of an employé does not relieve the master from liability, where its own negligence was also a contributing cause.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 515–534; Dec. Dig. § 201.*]

5. MASTER AND SERVANT (§ 289*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

The question of the contributory negligence of an employé held, under the evidence, properly submitted to the jury in an action for his injury against the master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089–1132; Dec. Dig. § 289.*]

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Defendant in error as plaintiff below recovered judgment for damages on account of personal injuries. The two counts on which the case was sub-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mitted to the jury were based on an alleged violation of the safety appliance acts. Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174); Act April 1, 1896, c. 87, 29 Stat. 85; Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885). In one count it was alleged that the defendant, an interstate carrier, "negligently, unlawfully, and contrary to the statutes of the United States in such case made and provided, hauled and used upon its said railway line and certain tracks connected therewith in moving interstate traffic a certain car equipped with a certain automatic coupler, which said coupler, the plaintiff alleges, was then and there in such a defective, broken, and inoperative condition of repair that it could not be coupled from the side of said car without the necessity of its switchman going between the end of said car and the car to which it was to be coupled; and the plaintiff further alleges that it then and there became his duty to the defendant as such switchman to couple said car so equipped with said defective, broken, and inoperative coupler onto a certain other car then standing upon the same track and but, to wit, a few feet from it, and as a direct result and in consequence of said defective, broken, and inoperative condition of said coupler he was then and there required to, and did, go between the ends of said cars for the purpose of repairing and adjusting said defective and inoperative coupler, so that said cars could be coupled together, and while he was so between the ends of said cars for the purpose and engaged in the work aforesaid, and while, as he alleges, he was exercising ordinary care and caution for his own safety, said cars were then and there shoved together, and as a direct result and in consequence of his being so required to go and be between the ends of said cars as aforesaid his right hand and wrist and arm were thereby then and there caught between said couplers and cars." The other count contained additional allegations to the effect that the engineer knew or ought to have known that plaintiff was between the cars and negligently moved the cars without giving plaintiff warning.

Questions regarding the applicability of the statute, the character of the conduct of the parties, and the correctness of certain instructions require that a summary of the evidence be given; and we adopt for the most part the statement given by counsel for the railway company.

Plaintiff had been employed by defendant for a year and a half as switchman in the Union Stockyards district in the city of Chicago. He had worked for three months prior to the accident with the same crew, consisting of engineer, fireman, conductor, rear switchman, and head switchman. He was the head switchman, and it was his duty to follow the engine.

In the Union Stockyards there were several different sets of tracks known by different names, and each constituted a different switching division. Plaintiff had worked at different times on all of these tracks; but for about three months prior to the accident he had switched up and down the Packingtown tracks, which consist of two tracks called the "east and west main tracks" running north and south from Fortieth street to Forty-Seventh street, and platform tracks and side tracks running at short intervals in both directions from these main tracks into different industries and switching yards. About three times a day during this time plaintiff's crew went for cars to the north end of the Packingtown west main track, and shoved them south, and distributed them over these different side tracks. The great bulk of business from that point was toward the south. The engine usually worked from the north end of the train, upon the west main track, but occasionally, when that track was blocked, would go over onto the east main track to do the same business. The business was purely a switching business.

The accident occurred December 7, 1906, between 9 and 10 o'clock in the morning. A train consisting of 14 or 15 freight cars, including car No. 6189 of the Armour Refrigerator Line, was standing on the north end of the Packingtown west main track for about an hour before 9 o'clock. The south car was several car lengths north of a street crossing known as "Exchange avenue." The engine with which plaintiff was working came from the south on the east main track without cars attached, and at about the north end of the cars standing on the west main track followed the curve in the track to the northwest to a switch clear around the curve, and then came back east

and south through the switch onto the west main track where plaintiff made a coupling of the engine with the north end of the standing train. The conductor, Corrigan, had' gotten off the engine at Exchange avenue to walk north along the standing cars and take the number of the cars, and to learn where they were to be switched. The rear brakeman, Shaw, stayed with the engine until about the time the coupling was made. Shaw gave a signal to the engineer to go back north, at which time Shaw discovered that the train was cut in two, six cars from the engine. He thought Conductor Corrigan had made the cut there, as the fifth and sixth cars from the engine were for delivery to Nelson Morris & Co. at a point northeast of where the train was standing. The six cars were pulled back northwest around the curve, and then shoved east onto the Nelson Morris & Co. track, where the fifth and sixth cars were cut off, and the engine with the four remaining cars attached went back again to the switch and shoved the four cars in again on the west main Packingtown track. Shaw rode on top of the fourth car from the engine, and plaintiff stood on top of the car next to the engine. As the four cars approached the standing train, Shaw gave a signal to stop, and, just before the cars came in contact, he saw that the knuckle upon the north car of the standing train was broken. This was Armour Refrigerator Line car 6189.

Up to that time Shaw had no knowledge that the coupler was broken. Conductor Corrigan also did not learn of the broken knuckle until that time. The conductor was then standing on the ground at a point near the opening between the cars in the standing train and the cars attached to the engine. Corrigan and Shaw examined the broken knuckle, and found that there was a new break at the point where the knuckle fitted into the lock which held the knuckle shut after the cars were coupled. The front part of the knuckle was in the same condition as though there had been no break, and there was nothing about the character of the break to prevent the car from being shoved further south.

Corrigan was assistant yardmaster as well as the conductor of this particular train, and he testified that·he had authority to decide what to do with the car. He decided to shove it south to a repair shop belonging to Armour & Co., known as the "Old Lipton House," which was about three blocks south of the point where these cars stood, and where a supply of knuckles of this type was kept, in order to get a knuckle to fit into the coupler. He testified that he could have repaired the car where it stood, but thought it more convenient to move the car. He walked south along the tracks to line up the switches for the this movement, and Shaw went to the south end of the train and got up onto the last car so as to signal the engineer when the switches had been set.

A short distance south of Exchange avenue Corrigan met a car inspector for Armour & Co., one Tony Tozinski, and told Tony there was a broken knuckle on an Armour refrigerator car, and that they were going to shove the train down, and asked Tony to get a good knuckle to replace it. Tony said that he would get it. He went to the car, looked at the coupler, found that it was a new Gould coupler with a fresh break across the tongue, and went back to his repair shanty and got another knuckle.

Plaintiff from the top of the car next to the engine saw Corrigan and Shaw talking, but did not know what they were doing, and remained on the car until he saw Corrigan walk down towards Exchange avenue to throw the switches. He knew that throwing the switches in this manner was the regular thing in switching south. He also saw Shaw walk down towards Exchange avenue. Plaintiff then walked down to where he had seen Corrigan and Shaw talking, and saw the opening between the cars and the broken knuckle. There was testimony, including that of Corrigan, that it was customary for brakemen on defendant's road whenever they found defects in couplers to repair them if they could. Plaintiff saw that the defect was in a Gould Improved Knuckle, and remembered that there was a knuckle of this description lying on the front end of the engine which plaintiff had himself picked up alongside the track, and placed there a short time before. Neither Corrigan nor Shaw knew that this knuckle was on the engine, and Corrigan did not know of any knuckle of that type nearer than the Lipton repair yard. There are 97 different catalogued varieties of knuckles, which

are not interchangeable, and will not work properly in any coupler except those of which they are especially designed as a part, and they are of varying weights. The weight of the knuckle of the Gould improved knuckle is 51 pounds. The testimony was conflicting in regard to there being a custom on defendant's road to carry a variety of these knuckles for repair purposes upon the front end of engines. The space on the front of the engine was four to five feet across and two to three feet wide.

Plaintiff walked up the west side of the train toward the engine for the purpose of getting the knuckle which he had placed there. On the next track west, parallel to the track upon which his train stood, a train of loaded coal cars was standing, and these cars also extended around the curve to the northwest. The space between the two trains was not more than three or four feet. They were so close to the train to which the engine was attached that the switchman could not see the engine from the point where the broken knuckle was, on account of the curve in the track; nor could the engineer see the point where the knuckle was located.

When plaintiff reached the engine, he had no talk with anybody. The engine pump was working and making a noise, and there was a stock train pulling out which made quite a noise. As to what took place at the engine the bill of exceptions is as follows: "I stepped up on the footboard, reached across and pulled the knuckle across to me, and then reached my left hand up and waved it like that [indicating], and the engineer saw it and looked right at me. I took hold of the knuckle and held it up and motioned like that [indicating]. It was about 12 or 14 feet from the engineer's windows to the front end of the engine, where I stood at the time. I never measured the distance. The engineer was on the west side of the engine, which is his side. I then went down to the opening with the knuckle."

Upon reaching the point where the break was, plaintiff took out the old knuckle and put the new one in place, and, while reaching for the pin to make the new knuckle fast, the car north of him was shoved south by the engine and his hand was caught. At almost the same time he heard a blast of the whistle.

Neither the conductor, nor the rear brakeman, nor the engineer, nor the fireman saw plaintiff at any time while he was attempting to replace the broken knuckle, and he did not tell any of them of his intention to make the replacement, unless plaintiff's signs to the engineer informed him. The conductor, the rear brakeman, and the fireman testified at the trial. The engineer died some months before the trial. The signal for the movement of the train which resulted in the injury to plaintiff was given by Conductor Corrigan after he had lined up the switches in the yard to the rear brakeman, Shaw, who transmitted them to the engineer. The fireman testified that two whistles were blown by the engineer before the engine started to move, and plaintiff and a track laborer, Patrick Shaw, testified that they heard the whistle signals at about the same time that the train started to move.

When the accident occurred, plaintiff cried out, and Switchman Shaw, hearing the shout, gave a signal to the engineer to stop the train, which moved only 20 feet. Shortly afterwards the car inspector, Tony, returned with the new knuckle and replaced it in the car as the train stood where it had been brought to a stop.

It was stipulated at the trial that Armour Refrigerator Line car 6189 was delivered to defendant during the morning of December 6th at a point about three-quarters of a mile distant from the place of this accident; that a car inspector of defendant inspected it at about 4 o'clock in the morning of December 6th and examined the couplings to see if they were in proper order and discovered no defect; that a number taker of defendant took a car record of a train in which this car was running at 9 o'clock in the morning of December 7th, the day of the accident; and that the train showed no break or opening at any point at that time. John W. Boland, a conductor for defendant, testified that he was in charge of the engine which moved the train containing this car onto the Packingtown west main track on the morning of December 7th; that he had no report, record, or recollection of discovering a broken coupler on the train, and that in the regular course of business, if a break had been discovered, a report would have been made of it.

A part of the court's charge to the jury was as follows:

"Now, when Corrigan discovered that the coupler was in such defective condition that it was necessary for a switchman to go between the ends of the cars to replace the knuckle in order that the cars might be coupled—that it was necessary for a switchman or other person to go between the ends of the cars to replace the knuckle in order that the cars might be coupled—it was his duty not to haul or use the car while the coupler was in that condition unless there was a necessity for so doing, and, if it was reasonably practicable in the prosecution of the defendant's business for him to have repaired the coupler or had it repaired where the car stood, it was his duty to do so, and the mere fact that it was more convenient for him to repair the knuckle at the place where the evidence shows he intended to repair it did not justify him in unnecessarily moving the car in its then condition to that place."

Opposed to this, defendant requested an instruction "that if it was a proper railroading proposition that the car could be repaired sufficiently by the movement to where supplies were kept, that if that was a reasonable thing to do, the defendant had the right to make that movement."

In another part of the charge the court told the jury that "ordinarily the conductor, engineer, fireman, and switchman of a train are fellow servants, and ordinarily neither can recover damages from the employer on account of an injury occasioned by either of the others; but in this case if you believe from the evidence that the authority which the defendant conferred upon Corrigan as conductor of the train in question, as assistant yardmaster, authorized and empowered him to decide whether to repair the coupler or have it repaired where the car stood, when he discovered it was broken, or to remove the car to another place for repair—and I charge you that the evidence in this case shows that Corrigan did have such authority—then Corrigan, in deciding which one of the two courses he would follow, was in that respect not a fellow servant of the plaintiff, but was a direct representative of the defendant company in that regard, and his action and conduct in that respect was in law the action and conduct of the defendant company."

Under various assignments of error the contentions for reversal are (1) that the safety appliance acts are unconstitutional; (2) that the acts do not apply to the car movement disclosed by the evidence; (3) that plaintiff in doing the work of repairing a coupler was not within the protection of the acts, the coupler provisions of which were designed only for those who are engaged in the work of coupling and uncoupling cars; (4) that plaintiff was guilty of contributory negligence as a matter of law on the undisputed facts; (5) that plaintiff's injury was caused or contributed to by the negligence of fellow servants, and therefore no recovery was permissible; (6) that error was committed in giving and refusing instructions; and (7) that plaintiff's counsel in argument to the court on the admissibility of testimony made improper and prejudicial statements in the presence and within the hearing of the jury.

John D. Black, for plaintiff in error.
James C. McShane, for defendant in error.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). In Wabash R. Co. v. U. S. and Elgin, etc., R. Co. v. U. S. (herewith decided) 168 Fed. 1, we have expressed our judgment that the safety appliance acts are constitutional

Was the car movement in question unlawful? From the acts of plaintiff and of the car repairer, Tony, in bringing new parts to the place where the defective car stood, the jury were justified in finding that it was reasonably practicable to make the repairs without

moving the car. Corrigan decided in favor of pushing the car to the place of supplies because he thought that there the repairs could more conveniently be made. The movement that was intended and under way when the plaintiff was caught was of a defective interstate car in connection with other cars on an interstate highway, and so was within the letter of the original act of 1893 as well as of the interpretative amendment of 1903. Now, if the exercise of reasonable care in maintaining the statutory standard of equipment will not exempt a car movement as being beyond the spirit, and therefore the reach, of the statute (St. Louis, Iron Mountain, etc., R. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; Chicago, Milwaukee & St. Paul R. Co. v. U. S. [C. C. A.] 165 Fed. 423 [decided Nov. 27, 1908]; U. S. v. Atchison, Topeka & Santa Fé R. Co. [C. C. A.] 163 Fed. 517; U. S. v. Denver & Rio Grande R. Co. [C. C. A.] 163 Fed. 519), much less will mere convenience be accepted as an excuse. Whether or not "overwhelming necessity" (Bishop on Stat. Crimes [3d Ed.] § 132; 1 Wharton's Cr. L. § 95) would be available as a ground of exemption is a question not properly arising on this record.

There was evidence to support a finding that it was within the scope of plaintiff's duty to endeavor to repair the coupler so that the train might be put together and the crew proceed with their work of distributing the cars. According to this view, plaintiff's act in substituting a new knuckle for the broken one in preparation for a coupling by impact was quite similar to Voelker's (Chicago, M. & St. P. R. Co. v. Voelker, 129 Fed. 522, 65 C. C. A. 226, 70 L. R. A. 264), in adjusting a defective coupler so that it would couple automatically. But we find nothing in the statute that limits the classes of persons to whom the carrier shall be responsible for damages that result directly and immediately from its illegal doings.

Section 8 provides that:

"Any employé of any such common carrier who may be injured by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned."

The statute would be honored only in its breach if the same facts that would defeat the employé under the common-law rule of assumed risk can be used to defeat him under the name of contributory negligence. Schlemmer v. Buffalo, etc., R. Co., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681. So plaintiff's knowledge of the physical conditions cannot be charged against him in determining the quality of his conduct in going and being between the cars. And, since he could not be crushed between quiescent cars, his knowledge that at every instant of time there was the possibility of the cars being moved by the act or direction of other employés is likewise irrelevant. The inquiry in our opinion is limited to whether other facts, independent of his knowledge of conditions and possibilities as aforesaid, establish plaintiff's negligence so conclusively that it was error to submit the matter to the jury as a question of fact. Plaintiff observed the conductor and rear brakeman talking together at the opening between the cars. When he went to the place, he saw the broken knuckle. The jury might well have inferred from this that plaintiff believed and had

reason to believe that the conductor and rear brakeman knew of the defect, and therefore of the unlawfulness of moving the car in that condition as a matter of mere convenience. The engineer, on account of the curve in the track and the other cars, could not see the opening. But he saw plaintiff carry a knuckle back along his train. Plaintiff made certain signs to the engineer. Before judge and jury plaintiff reproduced the pantomime. This is not preserved in the bill of exceptions. Defendant, having the burden here, therefore fails to show that there was no evidence from which the jury might warrantably have found that plaintiff believed and had reason to believe that the engineer knew that plaintiff was about to replace a broken knuckle somewhere in the train, and that it would be negligent, if not criminal, to move the train meanwhile. Under such circumstances, plaintiff would have the right to assume, until he had some notice to the contrary, that the conductor would not order the train to be moved and that the engineer would not start the locomotive. Contention is made that plaintiff was negligent because he did not put out car repairers' flags, for which a rule of the company provided. The purpose of such flags is to give notice that the car being repaired should not be moved. There was testimony that the rule was not applicable to situations like that disclosed in this case. Besides, if the posting of flags would not have further advised the engineer and conductor of their duty not to move the train, the jury presumably determined that the failure to post did not contribute to the injury. We conclude that the evidence in its entirety justified the submission of the issues to the jury.

Upon the carrier the statute lays the duty of seeing to it that no cars are hauled or used on its line that are not equipped according to the statutory requirements. This direct statutory duty cannot be evaded by assignment or otherwise. Therefore the act of the conductor who had charge of the train in deciding what should be done with the defective car was the act of defendant. As to the negligence of the engineer, it is immaterial whether it be taken as that of defendant or of a fellow servant of plaintiff, for defendant cannot be exempted from liability for its own negligence by reason of the concurrence of another's. Chicago, M. & St. P. R. Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787, Monmouth, M. & M. Co. v. Erling, 148 Ill. 533, 36 N. E. 117, 39 Am. St. Rep. 187; So. Pac. Co. v. Allen (Tex. Civ. App.) 106 S. W. 443.

That the instructions respecting fellow servants and the nature of the duty imposed by the statute are deemed by us to be correct sufficiently appears from our consideration of the case upon the evidence. Defendant's other requests need not be particularly noticed, for on comparison of them with the charge as given we find that they were substantially covered.

So far as we can determine from the printed page, no just criticism can be made of counsel's offers to prove or of his arguments in support thereof; and we accept the action of the trial judge in denying a new trial as proof that there was no impropriety in the manner in which the offers were presented.

The judgment is affirmed.