COLLINS v. MICHIGAN CENTRAL RAILROAD CO.

1. CARRIERS—INTERSTATE COMMERCE — ELECTRICITY — MASTER AND SERVANT.

Defendant was an interstate carrier engaged in business between the States. Plaintiff was employed by the railroad company, at repairing lines of telegraph and telephone and was a lineman of experience. At the time he was hurt he was one of a gang which repaired lines and was employed at new construction work. While erecting new wires at the yard in Michigan City, Indiana, to connect with another route or line, he received a severe shock and was burned by reason of a contact between the telegraph wire of defendant and a trolley wire. *Held*, that plaintiff was employed in interstate service and was included within the provisions of the employers' liability act, 35 U. S. Stat. 65, and that there was evidence in plaintiff's behalf which presented a question for the jury.

2. SAME—NEGLIGENCE—EVIDENCE.

And though plaintiff's fellow servant denied that he allowed the wire to slacken and strike the power wire, the question remained one of fact, under evidence tending to show the slackening of the wire.

3. SAME—APPORTIONING NEGLIGENCE—DAMAGES.

Instructions of the court to the jury, in substance, that plaintiff was entitled to such sum as would make him good, reducing the amount found due in proportion to the degree of neglect of which he might be found guilty, correctly stated the measure of damages and the rule of apportionment.

Error to Arenac; Sharpe, J. Submitted June 16, 1916. (Docket No. 50.) Decided September 27, 1916.

Case by Irvin Q. Collins, an infant, by his next friend, against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Cooley & Hewitt (Humphrey, Grant & Humphrey,* of counsel), for appellant.

*S. E. Hayes & Son (Coumans & Gaffney,* of counsel), for appellee.

MOORE, J.   This is a suit to recover damages for a personal injury sustained by the plaintiff while working as a lineman in Michigan City, Ind.   The accident occurred June 3, 1914.   Suit was brought under the Federal employers' liability act of 1908.   The result was a verdict of $6,000 in favor of the plaintiff.   A motion was made for a new trial, in denying which the circuit judge filed an elaborate statement of his reasons for doing so.   The case is brought here by writ of error.

There are 37 assignments of error which are grouped and discussed by counsel as follows:

(1) Is this case properly maintainable under the Federal act?

(2) Absence of proof of defendant's negligence and speculation and conjecture.

(3) Plaintiff's assumption of the risk.

(4) Plaintiff's contributory negligence.

(5) Improper measure of damages.

The first, and one of the most vital questions in the case, is the allowing a recovery under the Federal employers' liability act of 1908.   It was conceded by counsel on both sides that the applicability of the statute was a question of law, and the court charged the jury:

"It is conceded by counsel that it is a question of law, under the evidence submitted here, for me to determine whether or not the plaintiff was, at the time of his injuries, engaged in what is spoken of under this Federal law as 'interstate commerce.' * * * I say to you as a matter of law that the plaintiff at that time was engaged in interstate commerce, and that consequently the Federal statute is the one under which his rights are based."

It was and is conceded that the Michigan Central

is an interstate carrier engaged in an interstate business, but it is stoutly denied that plaintiff was engaged in interstate commerce when he was hurt. This claim makes it necessary to refer briefly to the facts. Plaintiff was about 18 years of age, of average intelligence. His home was at Sterling, Mich. When hurt, he had been at work for defendant about a year, and was regarded as an expert lineman. He was one of a gang of seven to ten men engaged in repairing the telegraph and telephone lines of defendant. During the year of Mr. Collins' employment he had worked in various cities along the line of the Michigan Central in three States, and had done various kinds of work, and on various wires and branches of the telephone and telegraph service which is maintained throughout the system.

At the time of the accident the Michigan Central Railroad Company maintained along its right of way over each of its divisions a telegraph, a telephone, and a signal system, maintaining for that purpose, on poles of the Western Union, along the right of way, two through telephone wires for the dispatcher's use, two through telephone wires for the message phone, and two signal wires. Within the yard and city limits of Michigan City, State of Indiana, for 20 years prior to the time of the accident, the Michigan Central Railroad Company also maintained an intercommunicating system, which was known as a yard telephone service. Starting at the depot, these wires ran first to the east end of the yard, to the yardmaster's office, where the first phone was maintained; then to the assistant yardmaster's office, where the second phone was maintained; then to the car repairer's shop, where the third phone was maintained; thence to the switch tender's shanty at the east end of the yard, where the fourth phone was maintained; thence to the interlocker on the

bridge where the fifth phone was maintained; thence to the old yard, where the sixth phone was maintained; thence to the roundhouse, where the seventh phone was maintained; and back to the depot, where the eighth and last phone was located. Prior to the time of the accident this entire system extended from the depot into the yard to the east of the depot. For three or four months prior to the time of the accident the plaintiff, together with the other members of his gang, had been engaged in work in the city of Michigan City, on this yard telephone system, but they had completed this work, and in the morning of the day of the accident they commenced to string two new wires from the first pole west of the depot to a box car used as an office at the transfer point between the defendant and the Monon Route 8,000 feet west of the depot.

The usual method of stringing two wires was to use a bridle, which consisted of a round stick from 2 to 3 feet long, with a short wire fastened at each end of the stick on the side opposite the loop, an end of each of the wires that were to be strung was fastened, a rope was then fastened in the center of the wire loop, and then by pulling on the rope the two wires were held apart by the stick and drawn along together, a rope being used because it is a nonconductor of electricity. At the first pole the rope would be passed over a cross-arm of the pole, and pulled by one of the men on the ground until the bridle reached the pole. Sometimes the wire was placed over a cross-arm, and sometimes the man who went up the pole would fasten a bracket on each side of the pole and pass the wire over the bracket instead of the cross-arm. On the morning of the accident they started stringing the wire for about half a mile to the west near Tenth street, along which the South Shore Electric Road ran at right angles to the wires. At that

point the wires were made fast to the pole and cut off. The reel was then taken west to the Monon transfer track, and the wires were again taken up a pole and strung in the same manner back to the east; the purpose being to haul half of the wire each way. The accident occurred about 2 o'clock in the afternoon. The wire had been strung back to the east from the Monon transfer, so that they were crossing Tenth street with the wire when the accident happened.

Alexander McEachern, a member of the gang, had gone up the pole on the west side of Tenth street, and the wire had been pulled up to him. The plaintiff took the rope and threw it over the trolley wire, which carried 6,600 volts of electricity, and then took the rope and climbed up the first pole on the east side of the street. The plaintiff, having carried the rope up the pole, dropped it over the cross-arm down to a fellow workman on the ground, who took the rope and pulled the bridle and the wires attached to it from McEachern across the street to the plaintiff. One of the wires in some way came in contact with the trolley wire, and plaintiff was severely burned and rendered unconscious. He remained lodged among the wires strung on the pole until rescued by men from the fire department, after the current had been turned off the trolley wire.

The language of the Federal statute involved here is:

"That every common carrier by railroad while engaged in commerce between any of the several States * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce." 35 U. S. Stat. 65.

It is the claim of defendant—we quote from the brief:

"The particular service at the time of the injury, therefore, being the criterion for applicability of the

act, and as it is well known that the service of many employees alternates between first intra and then inter state commerce indiscriminately, the Supreme Court of the United States was soon required to determine the precise degree of nicety to which the distinction between the two employments in such a case would be drawn."

It is contended that new construction work is never interstate commerce, and that, as the wires at the depot end were not attached to any wires there, and as there had never been a phone at the Monon box office, and as this new wire was being strung to be attached to a phone at the Monon box office, where there had never been one, it was new construction, and therefore intrastate commerce and not interstate commerce, counsel citing *Illinois Cent. R. Co.* v. *Behrens*, 233 U. S. 473 (34 Sup. Ct. 646, Am. & Eng. Ann. Cas. 1914C, 163) ; *Mondou* v. *Railway Co.*, 223 U. S. 1 (32 Sup. Ct. 169, 38 L. R. A. [N. S.] 44) ; *Van Brimmer* v. *Railway Co.*, 190 Fed. 394; *Shanks* v. *Railroad Co.*, 239 U. S. 556 (36 Sup. Ct. 188, L. R. A. 1916C, 797), and other cases to be found in the brief.

It must be conceded that the authorities are not uniform. A reading of the cases cited by counsel will show them distinguishable from the case before us. In Doherty on Liability of Railroads to Interstate Employees, p. 89, it is said:

"The act may fairly be interpreted to include all mechanics who are engaged at the time of injury upon instrumentalities which are generally and indiscriminately used for all the purposes of an interstate railroad, as, for instance, linemen, track repairers, and laborers engaged in the general maintenance of the interstate highway or its signal wires or apparatus and those whose duties relate to the construction, maintenance, and repair of those instrumentalities which are used in the business conducted by the interstate railroad without discrimination between the local or interstate character of its traffic. *Snead* v. *Rail-*

*way Co.*, 151 Fed. 608.   These general terms include the vast majority of the employees of an interstate railroad who may be affected by peril of accident; for, as railroads are practically conducted, there are few employees whose duty is so purely local that they have no relation to interstate traffic.   This interpretation of the act is sustained in the case of *Johnson* v. *Railway Co.*, 178 Fed. 643 (102 C. C. A. 89), in the circuit court of appeals for the eighth circuit. District Judge William H. Munger in the majority opinion said:

" 'It is argued that the employers' liability act can have no application to the case, as plaintiff was not an employee engaged in interstate commerce.   A part of his employment was to see the coupling of cars and the air hose upon the cars which were placed upon the transfer tracks.   Some of those cars, among them the one in question, were engaged in interstate commerce.'

"It is difficult to see why he was not an employee engaged in the movement of interstate commerce to as full an extent as a switchman engaged in the making up of trains in the railroad yards, as in the case of *Chicago Junction R. Co.* v. *King*, 169 Fed. 372 (94 C. C. A. 652)."

In *Coke & Coal R. Co.* v. *Deal*, 231 Fed. 604, the following language is used:

"The Supreme Court having declared that one who is injured while carrying spikes to be used in repairing a bridge over which interstate commerce is transported is deemed to be engaged in interstate commerce within the meaning of the act, it necessarily follows that, as in this instance, where one is injured while attempting to erect a telegraph pole to be used for the purpose of supporting wires over which messages are to be sent in directing the operation of trains in order that a company engaged in interstate commerce may safely operate its trains, such person is engaged in interstate commerce within the meaning of the act. It is strenuously contended that this construction would violate the rule announced by the Supreme Court in declaring the first employers' liability act unconstitutional, and lead to absurdities; in other

words that there would be no place where a line could be properly drawn. The answer to this contention is, we think, that whenever it appears that a party injured is engaged in employment that is necessary to the maintenance of any of the instrumentalities essential to the successful operation of a road by a carrier engaged in interstate commerce, such party is deemed to be engaged in interstate commerce, and in case of injury, while thus engaged, is entitled to any benefits accruing under the Federal employers' liability act."

See other cases cited in the brief of counsel.

In the instant case the plaintiff had been in the employ of defendant road, which has tracks in three States, at a monthly wage for nearly a year. He was nearly all the time stringing or repairing telegraph and telephone wires used for conveying messages necessary to the expeditious and safe movement, not only of local trains, but of trains passing in and out of the State. At the time of his injury he was stringing a wire on poles carrying wires which were used in interstate commerce. The primary purpose of stringing the wires he was handling was to enable the employee at the Monon box office to move cars coming in and going out of the State more safely and expeditiously. We think the plaintiff was engaged in interstate commerce.

2. Was there proof of defendant's negligence? We quote the testimony of plaintiff:

"Q. Mr. Collins, state whether or not there was any place or position that you could get in and do the work you were sent up on that pole to do than where you were.

"A. No; not under the circumstances I was on that pole in.

"Q. Now, the pole that you was on—Mr. Cressen was on the ground, the other side of that pole, was he?

"A. On the east side. There was nothing that Mr. Cressen could do, or he did not do anything that would cause any slack to slack back between the pole that

I was on and the 'pole that McEachern was on, not that I know of.

"*Q.* Now, was there anything that you did there that slackened that wire so that it dropped down?

"*A.* No, sir; there was not.

"*Q.* And in reaching over, if you say you did reach over, to reach one of the wires, state whether or not in any manner that was displaced, or did displace the bridle so as to slacken the wire in any manner from what you fastened it over the pin.

"*A.* Well, I had fastened it over the pin. and had my hand onto it, holding it right against that other cross-arm, against the pin, so that it could not get back anyway. There was just two people who had control of that wire in any manner there from that end; that was myself and Mr. Cressen, and Mr. Cressen did not in any manner, or could not slacken the wire.

"*Q.* And you say, also, that you did not, in any manner, permit that wire to slacken, and that it did not slacken from that end?

"*A.* Yes, sir."

It is true Mr. McEachern testified he did not slacken the wire, but this presented a fair question for the jury.

The next question calling for consideration is, Was there an improper measure of damages submitted to the jury? In answering this question, we can do no better than to quote from the opinion of the trial judge in denying the motion for a new trial:

"Was the verdict excessive? The plaintiff's injuries were surely very serious, and his suffering must necessarily have been intense. His own testimony and that of the members of his family indicate that he still suffers, and is likely to do so. His body is badly scarred, and considerable of the tissues have been destroyed. Very much larger sums have been paid for injuries, in my opinion, much less severe. This would seem to dispose of this particular reason assigned were it not for the fact that counsel, in their brief, insist that the court erroneously instructed the jury as to

the measure of damages in case they found the plaintiff himself to have been negligent as well as defendant. The matter of apportioning the damages in cases of such a finding by the jury was discussed informally between the court and counsel at considerable length, and all were agreed as to the rule to be applied. And in order that this rule as understood by defendant's counsel might be clearly stated to the jury, the court gave an additional request, prepared in pencil, and handed up by counsel, and which was the last word on the question to the jury. It reads:

"'Plaintiff is entitled to such sum as will make him good, only provided you find that McEachern was at fault, and he was not himself, in any way, at fault. But if you find that he was himself at fault you must reduce the amount which you believe would make him good in direct proportion to the amount of his fault.'

"This, I apprehend, is substantially as before stated in the charge. While not in the language suggested as appropriate in the case of *Norfolk & Western R. Co.* v. *Earnest,* 229 U. S. 114 (33 Sup. Ct. 656, Am. & Eng. Ann. Cas. 1914C, 172), it would seem that it could lead the jury to adopt no other course in apportioning such damages than is therein stated as the proper one. At all events, the court having instructed the jury on this matter just as requested by defendant, it would seem that it should be estopped from questioning the correctness of the instructions given."

The other questions raised by counsel have been considered. We do not think it necessary to discuss them.

Judgment is affirmed, with costs to appellee.

STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred.