GLENN BRIER, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC
RAILWAY COMPANY et al., Appellants.

COMMERCE:    Interstate—Preparation for Repair of Instrumental-
1    ity.    An employee is engaged in interstate commerce when, on
orders from his superior, and on a car furnished by the master,
he is *on his way* to repair an instrumentality of interstate com-
merce.

EVIDENCE:    Hypothetical Question—Proper Form.    When nature
2    has so far healed and repaired a physical injury that symptoms
of pain are purely subjective, a medical expert (first duly in-
formed of the nature, location, and extent of the original in-
jury) is not limited to an opinion as to what *might* or what
*could* cause the pain, but may state directly what, in his opinion,
*did* or *does* cause the pain.

TRIAL:    Verdict—$5,900—Excessiveness.    Verdict of $5,900 for per-
3    sonal injury reduced to $5,000.    Plaintiff suffered a severe in-
jury; but, at the time of trial, the limb was in such normal con-
dition that all symptoms of pain were purely subjective.

*Appeal from Washington District Court.*—HENRY SILWOLD,
Judge.

JUNE 27, 1918.

ACTION under the Federal Employers' Liability Act to
recover on account of personal injuries.    Verdict and judg-
ment for the plaintiff.    Defendant appeals.—*Affirmed.*

*F. W. Sargent, J. G. Gamble,* and *Eicher & Livingston,*
for appellant.

*McCoy & McCoy, C. A. Dewey,* and *W. H. Butterfield,*
for appellee.

GAYNOR, J.—This action is brought to recover damages on account of personal injuries sustained by the plaintiff while in the employ of the defendant company and its receiver, J. M. Dickinson.

1. COMMERCE: interstate: preparation for repair of instrumentality.

It is alleged that both plaintiff and defendant were, at the time plaintiff received his injuries, engaged in interstate commerce; that, in furtherance of its interstate commerce and in the operation of its interstate trains, defendant maintained and operated a line or lines of telegraph poles and wires along and on its right of way, adjoining its main line track; that the plaintiff was employed by the company as a lineman, and his duties were to repair these lines, under the direction of an agent or foreman; that he was so employed at the time he received his injury, September 21, 1915; that, under the Federal Employers' Liability Act, defendant is liable to the plaintiff for the injuries. It is alleged that the plaintiff, at the time, was on his way to assist in straightening some telegraph poles along the right of way; that he was being transported in a gasoline motor car, operated by the defendant company, under its receiver; that the car furnished and used for that purpose was defective and out of repair; was constructed with two cylinders, one of which was so out of repair that it failed to work, thus making the car run with a jumping motion; that the car was operated at a high and dangerous rate of speed; that the car was overloaded; that it was constructed to carry but three men, while four were directed and allowed to ride upon it, all of which facts were well known to the company; that, because of the defects in the car and the high speed at which it was operated, overloaded as it was, the same was derailed, resulting in the injuries to the plaintiff of which he complains. It is charged that he sustained injury to his left leg and ankle; that one of the lower bones of his left leg was broken, to wit, the fibula; that

his back was injured and several ribs were broken; that he was injured around and about his chest; that his nervous system was greatly impaired; that the injuries so received were permanent; that, as a proximate result of the injuries received, he is, and will be in the future, unable to perform manual labor,—or, at least, his ability is greatly impaired; that he has suffered great pain and anguish, and will continue to so suffer in the future.

To this claim the defendant interposed a general denial. The cause was tried to a jury, and a verdict returned in favor of the plaintiff. Judgment being entered upon the verdict, defendant appeals.

It will be noted that the plaintiff brings this action under what is known as the Federal Employers' Liability Act. To recover, therefore, the plaintiff must bring himself within the provisions of this act, and must show that both he and the defendant were, at the time of the injury, engaged in interstate commerce. The true test of employment in interstate commerce is: Was the employee, at the time of the injury, engaged in interstate transportation, or any work so closely related to it as to be practically a part of it? *Shanks v. Delaware, L. & W. R. Co.*, 239 U. S. 556.

The record shows that the foreman under whom plaintiff worked was instructed by the company to take this motor car to a point along the defendant's line where the telegraph poles needed straightening, and to straighten them. These were poles on which wires were strung and used by the company in directing the operation of the trains. The defendant's road was used in carrying freight and passengers between different states. Plaintiff was taken by the foreman to do the work so directed to be done, and was on his way to the place where these poles were, at the time he received his injury. He was not actually engaged in straightening the poles, at the time he received his injury, but was on his way, in company with the foreman, to

do the work of straightening them. The question arises: Was the employment of the plaintiff connected with interstate commerce, so as to bring him within the Federal Employers' Liability Act?

In *Ross v. Sheldon*, 176 Iowa 618, a question very similar to the one here under consideration was before this court. In that case, the action was brought under the state law. The defense then interposed was that decedent was engaged in interstate commerce at the time he received his injuries, and that his rights were governed by the Federal Act. In that case, as in this, the plaintiff was a lineman, and was injured. The railway was operated by electricity. The poles were along the line, and on these poles were cross-arms. Upon the cross-arms were wires. The defendant was engaged in putting additional cross-arms upon the poles. While at work in nailing cross-arms upon the poles, he was killed, by contact with a live wire. The claim of the defendant was that the poles and cross-arms and signal wires were a part of the necessary instrumentalities of defendant's interstate commerce, and that the injury to the decedent occurred while he was engaged in the work of repair and maintenance. This court said:

"The Federal Act in question laid upon the defendant, as a carrier of interstate commerce, not only the duty of mere *repair*, but the duty to maintain *sufficiency in its equipment*. The most that can be said in concession to the appellant is that the defendant was engaged in curing an 'insufficiency of equipment,' and that the decedent was engaged in work to that end. We reach the conclusion that the evidence brings the case within the operation of the Federal Act in question, and that this action, brought by the plaintiff under the state laws, was properly dismissed for that reason."

We think that case governs this. The only fact that distinguishes it at all is the fact that this plaintiff was

not, at the time of the injury, actually engaged in the repair of the instrumentality necessary to interstate traffic. This, however, we think is not a distinguishing factor.

In *Pedersen v. Delaware, L. & W. R. Co.,* 229 U. S. 146 (57 L. Ed. 1125), it appears that the injured party, an iron worker, employed by the defendant in the alteration and repair of bridges, under the direction of a foreman, was carrying from a tool car to a bridge, some bolts or rivets which were to be used that night or very early the next morning in repairing that bridge. He had not actually begun the work of repair, but was on his way to the bridge, carrying with him these bolts or rivets to be used in making the repairs. He was run down and injured by an intrastate passenger train. It was held that the plaintiff's employment brought him within the purview of the Federal Employers' Liability Act, and he was permitted to recover In that case, it was said:

"The point is made that the plaintiff was not, at the time of the injury, engaged in removing the old girder and inserting the new one, but was merely carrying to the place where that work was to be done, some of the materials to be used therein. We think there is no merit in this. It was necessary to the repair of the bridge that the materials be at hand, and the act of taking them there was a part of that work. In other words, it was a minor task which was essentially a part of the larger one, as is the case when an engineer take his engine from the roundhouse to the track on which are cars he is to haul in interstate commerce."

See, also, *St. Louis, San Francisco & Texas R. Co. v. Seale,* 229 U. S. 156 (57 L. Ed. 1129). In that case, deceased was a yard clerk. His principal duties were examining incoming and outgoing trains, making records of numbers and initials on cars, inspecting seals on the doors, checking cars, and supplying conductors with lists. At

the time of his injury and death, he was on his way through the yard to meet an incoming freight train. His purpose in going to the train was to take the numbers of cars, and otherwise perform his duties in respect to them. *While so going to his work,* he was injured. It was held that his employment brought him under the Federal Employers' Liability Act, though this particular question was not discussed in the opinion.

See *North Carolina Railroad Co. v. Zachary,* 232 U. S. 246 (58 L. Ed. 591). In that case, we find the following:

"Again, it is said that, because deceased had left his engine and was going to his boarding house, he was engaged upon a personal errand, and not upon the carrier's business. Assuming (what is not clear) that the evidence fairly tended to indicate the boarding house as his destination, it nevertheless appears that deceased was shortly to depart upon his run, having just prepared his engine for that purpose, and that he had not gone beyond the limits of the railroad yard when he was struck. There is nothing to indicate that this brief visit to the boarding house was at all out of the ordinary, or was inconsistent with his duty to his employer. It seems to us clear that the man was still 'on duty,' and employed in commerce, notwithstanding his temporary absence from the locomotive engine."

In the case under consideration, preparation had been made to go the place where the interstate work was to be accomplished, and plaintiff was on his way, with tools necessary for the work. The repairing of the poles upon which the wires were strung which were used by the defendant company in controlling and regulating the movement of its cars, both in intrastate and interstate commerce, was so closely related to interstate transportation, and so necessary to the proper regulation of interstate business, that it is, in the words heretofore quoted, practically a part of interstate business. He was on his way to do work closely

related to interstate traffic. He was carrying tools and instruments necessary to be used in doing the work assigned. He was injured while on his way to perform duties relating to interstate traffic. Under the holding of the above cases, his rights are regulated by the Federal Employers' Liability Act. See, also, as bearing upon this question, *Armbruster v. Chicago, R. I. & P. Co.*, 166 Iowa 155; *Collins v. Michigan Cent. R. Co.*, 193 Mich. 303 (159 N. W. 535); *Southern Pac. Co. v. Industrial Accident Com.*, 174 Cal. 16 (161 Pac. 1142); *Southern Pac. Co. v. Industrial Accident Com.*, 174 Cal. 8 (161 Pac. 1139).

The holding of the courts generally is that an employee of a railway company is engaged in interstate commerce when he is engaged in repairing or altering or reconstructing tracks or bridges over which interstate trains pass (*Pedersen v. Delaware, L. & W. R. Co.*, supra); when engaged in repairing, altering, or reconstructing a pumping house or pumping station already used in interstate commerce (*Narey v. Minneapolis & St. L. R. Co.*, 177 Iowa 606; *Clark v. Chicago G. W. R. Co.*, 170 Iowa 452); when engaged in repairing, altering, or reconstructing telegraph or telephone lines by which the operation of interstate trains is controlled and directed (*Collins v. Michigan Cent. R. Co.*, supra). Where the servant is employed and assigned to the work of repairing an instrumentality used in interstate commerce, all minor tasks which form a part of the larger one assigned are likewise interstate commerce, so much so as to bring a person so employed within the provisions of the act. For a full citation of authorities bearing upon this question, see Subdivision 7 of Note to *Lamphere v. Oregon R. & N. Co.*, 47 L. R. A. (N. S.) 52.

In *Deal v. Coal & Coke R. Co.*, 215 Fed. 285, it appears that the injured party was engaged in repairing telegraph lines owned by the railway company and used in the operation and movement of its trains. It was held that the in-

jured party was engaged in interstate commerce, and that the rights of the plaintiff in the suit were governed by the Federal Employers' Liability Act.   See, also, *San Pedro, L. A. & S. L. R. Co. v. Davide,* 210 Fed. 870, in which it was said, substantially, that there was no reason why a section hand, engaged in propelling a hand car furnished him by a railroad company to convey him to his camp, as the concluding part of his daily service of ballasting a track used in traffic between states, is not, while so doing, engaged in interstate commerce.

In *Grow v. Oregon Short Line R. Co.,* 44 Utah 160 (138 Pac. 398), it was held that a servant engaged in installing an automatic block system, who was injured by a collision with a train while being carried from his work on a tricycle, was engaged in interstate commerce, and could recover under the Federal Act.   See, also, *Horton v. Oregon-Washington R. & N. Co.,* 72 Wash. 503 (130 Pac. 897, 47 L. R. A. [N. S.] 8) ; *Lamphere v. Oregon R. & N. Co.,* 116 C. C. A. 156 (196 Fed. 336).

In *Eley v. Chicago G. W. R. Co.,* (Iowa) 166 N. W. 739, we have recently had occasion to consider this question. In this case, it is said:

"An employee, while on his way to and from his work, if employed in interstate commerce, injured by the negligence of his employer, is entitled to prosecute his action for damages under the Federal act."

Under these authorities, we have no hesitancy in saying that the facts disclosed in this record place plaintiff's case within the purview of the Federal Employers' Liability Act, and that the district court did not err in so holding.

At the conclusion of plaintiff's testimony, and again at the conclusion of all the testimony, the defendant moved for a directed verdict, on the ground that there was no showing by competent evidence that, at the time of the injury, either plaintiff or defendant was engaged in interstate

commerce. This is the first error assigned. For the reasons hereinbefore stated, we think this assignment cannot be sustained.

It is next contended that the court erred in making the record upon which the cause was submitted to the jury. This is predicated upon the assumption that the court erred in permitting certain questions to be propounded to certain doctors who appeared in the case as experts, and in permitting answers to the questions so propounded. It is claimed that the questions and answers invaded the province of the jury, and that, through them, the witnesses were permitted to state some of the ultimate facts in controversy, and so to decide for the jury that which it was the province of the jury alone to determine.

2. EVIDENCE: hypothetical question: proper forum.

The record discloses, before these witnesses were called, the following facts: That the plaintiff was 32 years of age; that the car in which he was riding was derailed while moving at a rate of speed variously estimated at from 10 to 20 miles an hour; that the car, weighing about 400 pounds, loaded with tools of the estimated weight of 100 pounds, fell on top of him, rolling him for some distance; that, when the car was taken off, his head was between his knees, and his left foot turned around; that he received a Potts fracture of the fibula; that there was a breaking or tearing away of the ligaments around the ankle, which caused hemorrhage; that there was injury of all the soft structures, muscles, nerves, blood vessels, ligaments, and tendons; that, after the fracture to the leg was reduced, the limb was placed in a cast, which was removed, after three or four days, for the purpose of dressing the wound; that thereafter, the cast was reduced, and continued for about six weeks; that after that, there was massage and passive motion of the ankle; that this continued for about three months, after which he walked on crutches; that, up to that time, he was

confined in bed; that, when he first began to use crutches, his leg would swell, and become blue; that, under the advice of his physician, he used a leather brace, to strengthen his ankle; that he was wearing this brace at the time of the trial; that there was impairment of the motion of the ankle joint; that the deltoid ligament was torn off completely, and other ligaments were twisted; that, while walking, he suffered pain in the injured limb on both sides, up and down.

He claimed he was suffering pain in his side, back, right shoulder, and right arm. At the time of the trial, there was no displacement in these parts which manifested the cause of the pain. As to the cause of these pains, these doctors were examined. The symptoms were subjective, and these pains were shown by the testimony of the plaintiff. The contention of the defendant is that these doctors ought not to be permitted to say what was the cause of the pain; that they were permitted to do so; and that it was error to permit them to do so. The defendant states its contention this way:

"Now, whether the plaintiff suffered an injury at the time of this accident, resulting in pain in his chest and back, was for the jury, because it was an ultimate fact, and because the evidence with respect to such fact was in conflict, and because the case quite largely was in controversy on this very proposition of fact. If the plaintiff suffered pain in his back, on the morning before the accident, it might be there was reason for the existence of such pain, independent of the accident; and if this is true, of course, there could be no responsibility on the part of the defendant therefor, because it is only for an injury resulting from the act of negligence that recovery could be sustained."

The doctors testified that they were unable, on examination, to discover any misplaced vertebrae, or any condition to which the claimed pain might properly be attrib-

uted; that, therefore, there was raised a question for the jury to determine, as to whether, in fact, the plaintiff suffered such pain as a result of the injury sustained at the time of the accident. The questions objected to were sub-stantially as follows:

"Q. State whether, in your opinion, and what, in your opinion, would those pains come from, or from what are they caused? What would you say was the cause of the present condition or ailment, supposing these facts to be true? A. The injury he sustained at the time was the cause of that. Q. Now, Doctor, assuming the fact to be true, as set forth in the hypothetical question just propounded by me to you, what would you say was the cause of the pain he experienced some thirteen months after the original injury? A. If he were in good health before, I would think, due to the accident."

We may assume, for the purposes of this case, that, under the rule laid down by this court, and followed with a persistency that would suggest that it ought to rest upon a sound basis of reasoning, an expert witness ought not to be permitted to state, as an ultimate fact, that about which there is controversy, where that fact is deducible only as a conclusion from other facts shown. *Sever v. Minneapolis & St. L. R. Co.,* 156 Iowa 664; *Kirby v. Chicago, R. I. & P. R. Co.,* 173 Iowa 144; *Martin v. Des Moines Edison Light Co.,* 131 Iowa 724, 739. In this last case, it is said:

"It is an accepted rule that, while experts may testify as to what in their opinion may or may not have been the cause of a given result or condition, it is not permissible for them to give their opinion as to the ultimate fact which the jury is organized to determine."

In the case at bar, the evidence disclosed just how the plaintiff was injured, and the character and extent of the injury, so far as ascertainable from a physical examination of the body. All the wounds and injuries which the plain-

tiff received, that could be determined from an examination of his body, were laid before the jury. The cause of these hurts and injuries, just how he was injured, and all the hurts resulting from the injury that could be told from an examination of the body, were laid before the jury. The plaintiff, however, complained that he was suffering pain. Whether he suffered pain or not could not be ascertained from an examination of the body. Whether the condition disclosed would produce the pain depended, naturally, on the location of the sensitive nerves, and whether they were involved in the injuries. A knowledge of the location of the injury and of the sensitive nerves, and of the effect of the injury upon the sensitive nerves, is essential to any correct idea as to whether the injury caused pain or not. This involved a knowledge of anatomy,—a knowledge of the relative location of sensitive nerves and the part injured,—whether sensitive nerves were involved in the injury. Unless sensitive nerves are involved in an injury, either directly or indirectly, no pain is manifest. The questions complained of were addressed peculiarly to the larger experience and knowledge possessed by these physicians. They called for that which the jury could not know or determine on their own initiative. The only questions that are now complained of are those questions touching the cause of the pain from which plaintiff claimed to suffer. The questions were so framed as to place before the jury the character and extent of the injuries, and the location of the pain complained of, and they were asked whether or not the pain which the plaintiff claimed to suffer was caused or was traceable to these injuries, and the answers were to the effect that the pain was traceable to these injuries. It is said that whether the plaintiff suffered pain or not was an ultimate fact, and the witnesses should have been asked as to what, in their opinion, might or might not have caused the pain; that it was error to ask them what

caused the pain. A knowledge of the anatomy of the human body and of the location of sensitive nerves is scientific knowledge, and requires special training, such as the medical profession are supposed to possess. Whether an injury to the human body will produce pain depends on whether or not sensitive nerves are involved in the injured part. Whether they are or not depends upon the relative location of the injury and the sensitive nerves. A knowledge of this requires special study and training. It is not within the knowledge of ordinary men. Medical experts have been permitted to say whether a certain wound caused death. Clearly, then, they ought to be permitted to say whether a wound caused pain. *Shelton v. State,* 34 Tex. 662; *Commonwealth v. Bell,* 164 Pa. 517 (30 Atl. 511). To say that pain complained of is due to injury received, is simply to say that sensitive nerves are involved in the part injured. To know whether sensitive nerves are involved or not, requires a knowledge of anatomy,—requires special learning. To say that pain was due to an injury is simply to say that sensitive nerves are involved in the part injured, and that pain is traceable to such injury. It is wholly impossible for the plaintiff to prove, other than by his own testimony, that he was suffering pain, except through the aid of science,—through the aid of those who have scientific knowledge of the anatomy of the human body. We had occasion, recently, to review this question, in *State v. Hessenius,* 165 Iowa 415, in which it is said:

"It was competent to show the condition of the body and its organs; and if, from such, there followed, to the trained mind of the expert, a conclusion not evident to the jury or to the unskilled in the particular matter under inquiry, if, to such witness, the conditions apparent or described to him spoke of a natural cause, when viewed in the light of science, his opinion as to such cause is competent."

It was also said:

"As applied to a case resulting in death, when the cause of death is necessary to be established, and is in dispute, whether it be in a civil or in a criminal action, we are satisfied that it is a correct and often necessary rule that, from the results of a personal examination, or in answer to a hypothetical question based upon such results, a physician whose qualifications entitle him to speak as an expert may, from the conditions exhibited or stated to him, give his opinion as to the cause of death, where such is peculiarly within the knowledge of his profession, and is not susceptible of direct proof by other means."

In *Smith v. Detroit United Ry.*, 155 Mich. 466 (119 N. W. 640), it was held that it was permissible for a doctor to state whether a cause, which it was alleged existed, would, in his opinion as a medical man, be sufficient to produce a condition which it was claimed resulted from this cause. See, also, *City of Chicago v. Didier*, 227 Ill. 571 (81 N. E. 698), in which it is said:

"The reason given for permitting a properly qualified witness to give his opinion as to what did produce certain results or consequences, and not what might have produced them, is that the fact to be established is, What did cause the conditions found to exist? Where the determination of that question involves scientific knowledge or skill, which is possessed only by those who have given the matter special study, and with which jurors and others engaged in the ordinary avocations of life are unfamiliar, a witness possessing the necessary qualifications may be asked for his opinion as to what did cause the conditions described. Such an opinion is not conclusive, and is subject to be contradicted by other evidence. It is for the jury to determine the weight and value of such opinions, when considered in connection with all the evidence in the case."

The same rule was laid down in *Hunt v. Lowell Gas*

*Light Co.*, 8 Allen (Mass.) 169 (85 Am. Dec. 697). In that case, it was claimed that injury resulted from inhaling gas escaping from pipes. It appears that the plaintiff had offered testimony touching the condition of his health, and that it was good before the escape of the gas into his house; that soon thereafter, he became ill. Physicians were asked what, in their opinion, caused the sickness, and they answered that it was caused by breathing gas. It was held by the court that this was proper to go to the jury, because the question required the expression of an opinion based upon scientific knowledge.

We are content to let this case rest on the rule laid down in *State v. Hessenius*, supra, which is recognized in *Kirby v. Chicago, R. I. & P. R. Co.*, supra, and in *State v. Brackey*, 175 Iowa 599.

It is next contended that the verdict is excessive. The jury returned a verdict for $5,900. While we are not inclined to interfere with the verdicts returned by jurors in personal injury cases, yet a careful reading of this record leads us to the conclusion that the verdict is excessive, and that a fair compensation for the injuries received does not exceed $5,000. The amount of recovery is, therefore, ordered reduced to $5,000, with interest at 6 per cent from the date of the rendition of the judgment. With this modification, the judgment is—*Affirmed*.

3. TRIAL: verdict: $5,900: excessiveness.

PRESTON, C. J., WEAVER and STEVENS, JJ., concur.